### WOOD v. CENTRAL SAND & GRAVEL CO. et al.

#### No. 98.

District Court, W. D. Tennessee, W. D.

May 3, 1940.

Ben C. Welch, of Memphis, Tenn., for plaintiff.

John Montedonico, of Memphis, Tenn., for defendants.

### Findings of Fact.

MARTIN, District Judge.

The plaintiff, a nightwatchman, brought his civil action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. §§ 201–219, against the defendants for $876.15 wages, plus a like amount as liquidated damages, and for reasonable attorney's fees, and costs.

The defendant, Central Sand & Gravel Company, was at the time the plaintiff went to work there a subsidiary corporation of the defendant, Fischer Lime & Cement Company, a Tennessee corporation; and, after the surrender of its charter of incorporation on October 31, 1938, continued to conduct its same business under the same name as a branch of the defendant, Fischer Lime & Cement Co. For approximately nine years prior to the period involved in the instant litigation, the plaintiff worked in the employ of the defendant Central Sand & Gravel Company.

It is alleged in the complaint and admitted in the record that the plaintiff worked continuously for the defendants from October 24, 1938 (the effective date of the Fair Labor Standards Act of 1938), until November 14, 1939, constituting a period of fifty-five weeks. His working hours were thirteen and one-half hours per day, from 5:30 o'clock P. M., until 7:00 o'clock A. M., for a full seven-day week, making a total of ninety-four and one-half hours of labor per week. He was paid the flat sum of fourteen dollars ($14) per week. It is conceded as a matter of fact that, if the Fair Labor Standards Act of 1938 is applicable to the situation of plaintiff, he would be entitled to receive on the minimum wage schedule provided in the Act over-time pay for fifty and one-half hours of overtime each week, which would raise his total weekly pay to $29.93. Having received only fourteen dollars ($14) per week, he would, therefore, be entitled to receive fifteen dollars and ninety-three cents ($15.93) additional pay for each week embraced in the period from October 24, 1938, to November 14, 1939, bringing

the total amount due him to $876.15, for unpaid wages due him under the Fair Labor Standards Act.

The Fischer Lime & Cement Company has been long engaged in Memphis and its adjacent territory in the building material and supply business; and caused the Central Sand & Gravel Company to be incorporated as a subsidiary, to conduct the sand and gravel business of the Fischer Company. The record shows that the intra-state (Tennessee) business of the Fischer Lime & Cement Company extends to a range of eighty to eighty-five per cent of its total sales; from which it follows that fifteen to twenty per cent of its sales constitute *inter-state* business.

The inter-state sales of the Central Sand & Gravel Company from October 24, 1938, to November 14, 1939 (the wage period involved herein), amounted to six and one-half percent of its total sales; while for the period from January 1, 1938, to October 24, 1938, the total out-of-state sales of the Central amounted to the insignificant percentage of one-tenth of one percent of total sales. The proof shows that the step-up in percentage was due to the fact that during the months of March, April and May, 1939, customers of Missouri Portland Sand & Cement Company and Marquette Portland Cement Company could not procure gravel from them, due to high water conditions on the Mississippi River and plant reconstruction, and were compelled to buy their requirements from Central.

Proof shows that, on the 8th and 9th of March, 1939, the Central Sand & Gravel Company shipped by rail from Memphis, in inter-state commerce, 11 car-load lots of gravel; eight car loads of which were shipped to a consignee at Marked Tree, Arkansas, and one car-load of which was shipped to a consignee at West Memphis, Arkansas. Fischer Lime & Cement Company, on March 22, 1939, shipped two car loads of gravel from the plant of Central to a consignee at Olive Branch, Mississippi. These shipments in tonnage aggregated 680.25 tons, for a total sales price of $570.64.

From March 21, 1939, to May 29, 1939, the defendant, Central, sold 275.6 tons of gravel to a customer at West Memphis, Arkansas, who transported the gravel purchased from Memphis, Tennessee, to West Memphis, Arkansas, in the customer's own trucks. There was evidence, also, of specific sales in small quantities to inter-state commerce customers at West Memphis, Arkansas, and to customers in Byhalia, Tunica, Lake Cormorant and Nesbit, Mississippi. Other sales were made at the plant of Central to persons using Mississippi and Arkansas licensed trucks.

The evidence discloses that the total sales price of the sand and gravel sold by the Central Company during the period involved amounted to $12,522.64; whereof the portion of such sand and gravel that was transported into other states amounted to $884.36. It appears, further, that the defendants sell the major portion of their products, consisting of building material and supplies, to the City of Memphis, the State of Tennessee, the Works Progress Administration and to contractors, who, in turn, use the same in construction work; and that many of such sales are in bulk lots.

It is evident from checks introduced into the record that the wages of the plaintiff for the full period of time embraced in the controversy, except the first week thereof, were paid by Fischer Lime & Cement Company. Only the first week's wages for the period were paid by Central Sand & Gravel Company. It appears, however, that the accounts of the Central branch of the Fischer Company were kept separately; and that the Central accounts were charged with the wages paid plaintiff by the Fischer Company.

It appears from the evidence, that the forms used in the sale by Central of materials were receipted by the customer to whom the goods were delivered in the name of Fischer Lime & Cement Company. But the sales slips covering all sales of material by Central, or by Fischer from the Central plant, were billed on the stationery of and in the name of Central Sand and Gravel Company.

The record reveals that as a part of his duties the plaintiff, in addition to serving as nightwatchman to protect all the property and equipment of the defendant at its Riverside plant, fired the engine so as to keep up steam and have the engine ready for use each morning.

### Conclusions of Law and Opinion.

On the foregoing facts, the defendants contend that the Fair Labor Standards Act of 1938 (June 25, 1938, Ch. 676, Sec. 1, 52 Stat. 1060, 29 U.S.C.A. §§ 201 to 219,

incl.), is not applicable to this case, for the reason that (1) the plaintiff is not an employee "who is engaged in commerce or in the production of goods for commerce" within the meaning of the Act, 29 U.S.C.A. §§ 206, 207, Secs. 6 and 7 of Ch. 676, 3rd Session, 75th Congress, Public Act No. 718; and that (2) the plaintiff falls within the exemption provided for "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce", 29 U.S.C.A. § 213(a) (2), Sec. 13(a) (2) of Ch. 676, 3rd Session, 75th Congress, Public Act No. 718.

■ (1) The first question presented on the facts found is, therefore, was the plaintiff as an employee of the defendants engaged in the production of goods *for interstate commerce*? Counsel for defendants stresses the decision of Judge Miller in Bagby v. Cleveland Wrecking Co., D.C.W.D.Ky. (June 23, 1939) 28 F.Supp. 271, 272, in which a complaint under the Fair Labor Standards Act of 1938 was dismissed because the petition failed to state facts showing plaintiffs to have been engaged in "the 'stream of commerce,' as described in the Jones & Laughlin case [infra]."

In National Labor Relations Board v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352, the Supreme Court upheld the constitutionality of the National Labor Relations Act of July 5, 1935, 29 U.S.C.A. § 151 et seq., and speaking through the Chief Justice, said (op., 301 U.S. 37, 38, 57 S.Ct. 624, 81 L.Ed. 893, 108 A.L.R. 1352): "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control. * * * The close and intimate effect which brings the subject within the reach of federal power may be due to activities in relation to productive industry although the industry when separately viewed is local."

Indeed, even in Schechter Poultry Corp. v. United States, 295 U.S. 495, 544, 55 S.Ct. 837, 849, 79 L.Ed. 1570, 97 A.L.R. 947, the Court said: "We have held that, in dealing with common carriers engaged in both interstate and intrastate commerce, the dominant authority of Congress necessarily embraces the right to control their intrastate operations in all matters having such a close and substantial relation to interstate traffic that the control is essential or appropriate to secure the freedom of that traffic from interference or unjust discrimination and to promote the efficiency of the interstate service."

The obvious purpose described by Congress in its declaration of policy, in Section 2 of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 202, was to obviate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." To accomplish the beneficent purposes of the Act, Congress manifestly intended and expected the courts to apply broadly and liberally the coverage of the Act to include those engaged in the production of goods, a portion of which were designed for interstate commerce. The legislative history of the Act supports this view, and it would be plainly defeating the clear intention of Congress should the courts limit the applicability of the Act, by restrictive judicial contraction of interstate commerce.

■ The argument is made in behalf of defendants that in cases where Courts of Appeal have upheld the applicability of the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., substantially larger percentages of the goods produced were intended for interstate commerce than is true in the case at bar. In support of this contention, defendants cite Standard Lime & Stone Co. v. National Labor Relations Board, 4 Cir., 97 F.2d 531, in which a manufacturer of lime-stone products sold eighty-three percent of his output in other states; National Labor Relations Board v. A. S. Abell Co., 4 Cir., 97 F.2d 951, 955, in which most of the raw materials used by a newspaper were shipped into the state and 16.85 percent of the paper's circulation was shipped outside the state; National Labor Relations Board v. Carlisle Lumber Co., 9 Cir., 94 F.2d 138, in which ninety percent of the company's products were shipped out of the state; National Labor Relations Board v. Wallace Mfg. Co., 4 Cir., 95 F.2d 818, in which a cotton textile manufacturing plant shipped seventy-five percent of its products directly out of the state; Nation-

al Labor Relations Board v. Eagle Mfg. Co., 4 Cir., 1938, 99 F.2d 930, in which approximately seventy-five percent of materials used by a manufacturer were received from outside the state and approximately ninety-five percent of the finished products were shipped to points outside the state; and National Labor Relations Board v. Fashion Piece Dye Works, 3 Cir., 100 F.2d 304, in which fifty to ninety percent of goods processed were received from points outside the state by a company which transported in its own trucks to such points the goods received.

Counsel for defendants cites, also, two decisions of the Sixth Circuit Court of Appeals: Clover Fork Coal Co. v. National Labor Relations Board, 6 Cir., 97 F. 2d 331, and National Labor Relations Board v. Louisville Refining Co., 6 Cir., 102 F.2d 678, 679 (March 13, 1939), in the first of which a coal mining company sold all of its production exclusively to a national coal sales company, f. o. b. the mine, "the bulk" of the coal being transported to other states; and in the second of which the court stated, in holding that an oil refining company operating in Louisville, Kentucky, was engaged in interstate business: "A substantial part of the raw materials and the crude oil used originates outside of Kentucky, and much of the gasoline, kerosene and other finished products is distributed to Ohio, Indiana and Kentucky".

The argument based on the foregoing authorities that the percentages between interstate and intrastate commerce in the distribution of goods produced is a material consideration is utterly demolished by two decisions of the Supreme Court of the United States. In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, 303 U.S. 453, 467, 58 S.Ct. 656, 660, 82 L.Ed. 954 (decided March 28, 1938) the Chief Justice said: "There is thus no point in the instant case in a demand for the drawing of a mathematical line. * * The critical words of the provision of the National Labor Relations Act in dealing with the described labor practices are 'affecting commerce,' as defined. Section 2(7), 29 U.S.C.A. § 152(7). It is plain that the provision cannot be applied by a mere reference to percentages, and the fact that petitioner's sales in interstate and foreign commerce amounted to 37 per cent., and not to more than 50 per cent., of its production cannot be deemed controlling."

In National Labor Relations Board v. Fainblatt, 306 U.S. 601, 606, 607, 59 S.Ct. 668, 671, 83 L.Ed. 1014 (decided April 17, 1939), Mr. Justice Stone, speaking for the Court, said: "Nor do we think it important, as respondents seem to argue, that the volume of the commerce here involved, though substantial, was relatively small as compared with that in the cases arising under the National Labor Relations Act [29 U.S.C.A. § 151 et seq.] which have hitherto engaged our attention. The power of Congress to regulate interstate commerce is plenary and extends to all such commerce be it great or small. Hanley v. Kansas City Southern R. Co., supra [187 U.S. 617, 619, 23 S.Ct. 214, 47 L.Ed. 333]. The exercise of Congressional power under the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, the Clayton Act, 38 Stat. 730, the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., or the National Motor Vehicle Theft Act, 18 U.S.C.A. § 408, has never been thought to be constitutionally restricted because in any particular case the volume of the commerce affected may be small. The amount of the commerce regulated is of special significance only to the extent that Congress may be taken to have excluded commerce of small volume from the operation of its regulatory measure by express provision or fair implication. * * * Given the other needful conditions, commerce may be affected in the same manner and to the same extent in proportion to its volume, whether it be great or small. Examining the Act in the light of its purpose and of the circumstances in which it must be applied we can perceive no basis for inferring any intention of Congress to make the operation of the Act depend on any particular volume of Commerce affected more than that to which courts would apply the maxim de minimis."

During the wage period involved in the controversy herein, the interstate sales of the Central Sand and Gravel Company amounted to only six and one-half percent of its total sales. "Central Sand and Gravel Company", however, is only a trade name for the sand and gravel business of the real defendant, Fischer Lime & Cement Company, whose interstate business constitutes fifteen to twenty percent of its total sales. The interstate commerce here involved is, therefore,

plainly substantial. De minimis doctrine could not remotely apply to the facts found with respect to interstate commerce transactions in the instant case.

■ As shown in the record, numerous sales of material by the defendants to customers who transported the same to Mississippi and Arkansas in their own trucks would be embraced in interstate commerce. In Santa Cruz Fruit Packing Co. v. National Labor Relations Board, supra, the Supreme Court said (op., 303 U.S. 463, 58 S.Ct. 659, 82 L.Ed. 954): "There is no question that petitioner was directly and largely engaged in interstate and foreign commerce. We have often decided that sales to purchasers in another state are not withdrawn from federal control because the goods are delivered f. o. b. at stated points within the state of origin for transportation. See Savage v. Jones, 225 U.S. 501, 520, 32 S.Ct. 715, 56 L.Ed. 1182; Texas & N. O. R. Co. v. Sabine Tram Co., 227 U.S. 111, 114, 122, 33 S.Ct. 229, 57 L.Ed. 442; Pennsylvania R. Co. v. Clark Bros. Coal Mining Co., 238 U.S. 456, 465–468, 35 S.Ct. 896, 59 L.Ed. 1406."

Two district court decisions are cited by defendants: Foster v. National Biscuit Company, D.C., Feb. 20, 1940, 31 F.Supp. 552, 553, and Gates v. Graham Ice Cream Company, D.C., March 1, 1940, 31 F.Supp. 854. In both these cases, the plaintiffs were granted permission to amend their complaints, upon penalty of dismissal, to allege sufficient facts to place the cases within the purview of the Fair Labor Standards Act, the complaints as filed being deemed insufficient because they failed to show explicitly and distinctly that the plaintiffs were in their employment engaged in interstate commerce.

In the case at bar, no motion to dismiss on the pleadings was made, but the defendants' answer denied interstate commerce activities; and when the case came to trial evidence was adduced presenting fact issues which have been resolved by the foregoing findings of fact. Consequently, the district court decisions cited by defendants are not in point.

■ The contention is made that in his work as nightwatchman, the plaintiff was not engaged in interstate commerce; and that, therefore, he is not entitled to the benefit of the provisions of the Fair Labor Standards Act as to wages and hours.

First, looking to the Act itself, Section 3(j) provides a broadly comprehensive definition of those engaged in the "production of goods for [interstate] commerce". It is expressly stated that "For the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State". 29 U.S.C.A. § 203(j).

In interpretive bulletin No. 1, issued November 1938, from the office of the General Counsel of the Wage and Hour Division of the United States Department of Labor, the benefits of the statute by the above-quoted section are said to extend to persons employed as watchmen.

Counsel for defendants emphasize three decisions denying inclusion of nightwatchmen in the coverage of the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. New York Central R. Co. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629; Wabash R. Co. v. Industrial Commission, 286 Ill. 194, 121 N.E. 569; Califore v. Chicago, St. P., M. & O. R. Co., 1935, 220 Iowa 676, 263 N.W. 29. An examination of the facts of each of these cases plainly differentiates them from the case on trial. In the White case, the nightwatchman was charged with the duty of guarding tools and materials intended to be used in the construction of a new station and new tracks upon the line of a railroad designed for use, when finished, in interstate commerce. The Court said (op., 243 U.S. 192, 37 S.Ct. 248, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629): "Decedent's work bore no direct relation to interstate transportation, and had to do solely with construction work, which is clearly distinguishable, as was pointed out in Pedersen v. Delaware, Lackawanna & Western R. Co., 229 U.S. 146, 152, 33 S.Ct. 648, 57 L.Ed. 1125, 1128, Ann. Cas.1914C, 153." The Supreme Court states that the test is, "Was the employee at the time of the injury engaged in interstate transportation, or in work so closely related to it as to be practically a part of it?", citing Shanks v. Delaware, Lackawanna & Western R. R. Co., 239

U.S. 556, 558, 36 S.Ct. 188, 60 L.Ed. 436, L.R.A.1916C, 797.

In a later case, Southern Pacific Company v. Industrial Accident Commission, 251 U.S. 259, 40 S.Ct. 130, 64 L.Ed. 258, 10 A.L.R. 1181, the Supreme Court cites the Pedersen case, the Shanks case, and also New York Central R. Co. v. Porter, 249 U.S. 168, 39 S.Ct. 188, 63 L.Ed. 536, and Kinzell v. Chicago, M. & St. P. R. Co., 250 U.S. 130, 39 S.Ct. 412, 63 L.Ed. 893, and says (op., 251 U.S. 263, 40 S.Ct. 131, 64 L.Ed. 258, 10 A.L.R. 1181): "Generally, when applicability of the federal Employers' Liability Act [45 U.S.C.A. § 51 et seq.] is uncertain, the character of the employment, in relation to commerce, may be adequately tested by inquiring whether, at the time of the injury, the employé was engaged in work so closely connected with interstate transportation as practically to be a part of it."

Applying the true principle of these Supreme Court decisions to the facts concerned here, it is found that the plaintiff, serving as he was as nightwatchman to protect all the property and equipment at an employer's plant where interstate commerce goods were produced and also performing the additional duties of firing an engine so as to keep up steam and have the engine ready each morning for use in connection with interstate commerce, was in actuality engaged in the production of goods for interstate commerce within the meaning of Sections 6 and 7 of the Fair Labor Standards Act of 1938. Certainly, Congress intended no such unjust discrimination against a nightwatchman, situated as was the plaintiff in the instant case, as would result from an unjustifiably narrow interpretation of the humane Fair Labor Standards Act.

■ (2) Finally, it must be determined whether the plaintiff falls within the exemption contained in Section 13(a) (2) of the Fair Labor Standards Act. Was he "engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce"? The defendants maintain that he was; and have presented several state decisions differentiating between wholesale and retail business under tax laws. The following of these authorities have been examined: Albuquerque Lbr. Co. v. Bureau of Revenue of New Mexico, 42 N.M. 58, 75 P.2d 334; Commonwealth v. Gormly, 173 Pa. 586, 34 A. 282; State v. J. Watts Kearny & Sons, 181 La. 554, 160 So. 77; State v. Christhilf, 170 Md. 586, 185 A. 456; Lone Star Cement Corp. v. State Tax Commission, 234 Ala. 465, 175 So. 399; Wiseman, Com'r, v. Gillioz, 192 Ark. 950, 96 S.W.2d 459; Blome Co. v. Ames, 365 Ill. 456, 6 N.E.2d 841, 111 A.L.R. 940; Mason Lbr. Co. v. Lee, 126 Fla. 371, 171 So. 332.

The authorities listed above apply a variety of state taxation laws to varying circumstances involved in the operation of numerous diverse business enterprises. Taken all together, or separately, these opinions are of small value to correct adjudication on the point of law here presented. The most pertinent case on the list is Mason Lbr. Co. v. Lee, supra, in which it was held that bulk sales of lumber and building materials by retail lumber yard operators to contractors who transfer such materials to property owners in performing construction contracts were not "retail sales" within the meaning of the Florida Chain-Store Tax Act of 1935, Acts Fla.1935, c. 16848.

Whether Section 13(a) (2) applies must be determined, in each case, upon all the facts shown in the record. Certain common-sense considerations, however, are appropriately applied as criteria in all cases. Among these, it is obvious that the applicability of Section 6, covering minimum wages, and of Section 7, covering maximum hours, depends upon the nature of the *employment of the individual employee;* while the exemption provided in Section 13(a) (2) depends upon the nature of the *business conducted by the employer.*

Another obvious distinction, between Section 6 and 7 on the one hand and Section 13(a) (2) on the other, is that, under the former, *some* employees in any given business enterprise may be covered by the Fair Labor Standards Act and others not; while, under the latter section, *all* the employees of the industry are exempted, if any are.

■ It, therefore, follows that the defense based upon the exemption provided in Section 13(a) (2) is sound only if it appears that the real defendant is a "retail or service establishment the greater part of whose selling or servicing is in intrastate commerce". By no stretch of the imagination could either the Fischer Lime & Cement Company or its trade-name branch, Central Sand & Gravel Com-

pany, be called properly a "service establishment". The defendants do not operate barber shops, beauty parlors, shoe-shining parlors, clothes pressing clubs, laundries, automobile repair shops, or the like. In its interpretative bulletin No. 6, issued December 7, 1938, the Wage and Hour Division of the Department of Labor has defined a "retail establishment" as one which "sells merchandise to the ultimate consumer for direct consumption, and not for purposes of re-sale in any form".

This definition does not appear to be sufficiently comprehensive. Indeed, the Department of Labor, itself, seems to recognize that it is not; for in its Release No. R-116, December 7, 1938, this statement appears: "A retail establishment generally sells its merchandise in small quantities and at prices higher than the price involved in sales to wholesalers or jobbers. Thus, for example, it would seem that a coal company engaged in selling large orders of coal at a discount from the regular retail price would not be a retail establishment under Section 13(a) (2), notwithstanding the fact that the coal is purchased for direct consumption and not for purposes of re-sale in any form."

It is hard to conceive that the defendant in the instant case can be regarded as a "retail establishment". In plain English, Webster's New International Dictionary, Second Edition, Unabridged, defines "retail" as "the sale of commodities in small quantities or parcels", and "wholesale" as "the sale of goods by the piece or in large quantities". A large building material and supply house which shipped by rail in interstate commerce to one customer, in two days, eight car loads of gravel could not be correctly said to be selling in small quantities. Nor could such supply house be deemed a retailer, when the major portion of its sales—many in bulk lots—were made to a city of more than 250,000 inhabitants, to a large State, to an important governmental agency, the Works Progress Administration, and to many contractors who use the material in their construction work.

Conceding that the defendant, Fischer Lime & Cement Company, in its entire business, as well as in its trade-name branch dealing in sand and gravel, makes many retail sales; yet, if it also does a substantial wholesale business, its business taken as a whole should not be considered a "retail establishment" within the meaning of the exemption provided in Section 13(a) (2) of the Fair Labor Standards Act of 1938.

Judgment will be awarded the plaintiff, W. W. Wood, against the defendants, Fischer Lime & Cement Company, and its subsidiary branch, Central Sand & Gravel Company, for Seventeen Hundred Fifty-Two Dollars and Thirty Cents ($1,752.30), and costs; and for a reasonable fee to the attorney for plaintiff in the amount of Two Hundred and Fifty Dollars ($250).