## FLEMING v. ARSENAL BLDG. CORPORATION et al.

### No. 87.

Circuit Court of Appeals, Second Circuit.

Dec. 30, 1941.

See, also, 38 F.Supp. 675.

Irving J. Levy, of Washington, D. C., for appellant.

Walter Gordon Merritt, of New York City, for appellees.

Before L. HAND, C. E. CLARK, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The plaintiff appeals from a judgment, dismissing after trial his complaint against the defendants—filed under § 17 of the "Fair Labor Standards Act of 1938"—to restrain violation of § 15(a) (2) of that act 29 U.S.C.A. §§ 217, 215(a) (2). The only question is whether § 7(a) 29 U.S.C.A. § 207(a) requires the defendants to pay "time and a half" to their employees. (We may ignore the defendant, Spear & Co., Inc., for any decision as to it must concededly follow that as to the Arsenal Building Corporation, of which we shall speak as the defendant.) The facts are as follows. The defendant owns a twenty-two story loft building in New York City, of which it lets out substantially all the space to manufacturers of women's clothes,

who are concededly engaged in interstate commerce: i.e., they import part of their raw materials into the state and send out of the state a large part of the completed clothes. (With the exception of three of these manufacturers, the sales of two of whom were very small, the percentage of interstate shipments was in every case more than two-thirds; the percentage of the total shipments was 82.) All but two occupy less than a single story of the building; one occupies one and a half stories, and the other, five and a half. The defendant has no other business but leasing the space, collecting the rent and such services as are incidentally necessary: e.g., protecting the tenants' property, keeping the building itself clean, warm, lighted and in repair, furnishing steam and hot water, and manning and running the elevators. To render these services it employs 25 workmen of various sorts (besides a superintendent, concededly not within the act) and it has refused to pay them "time and a half" for overtime as defined by § 7(a) (1) and § 7(a) (2) of the act. The plaintiff's position is that, although these employees do not have any part in the actual handling of materials or of the finished goods (except insofar as running the elevators may be such) they are nevertheless "engaged in commerce" and "in the production of goods for commerce" within § 7(a). The defendant denies this, and further asserts that it is in any case exempted by § 13(a) (2), 29 U.S.C.A. § 213(a) (2) because the employees are engaged in a "service establishment the greater part of whose * * * servicing is in intrastate commerce." Finally it says that the act does not cover the employees of employers who are not themselves "engaged in commerce or in the production of goods for commerce." The district judge held that the employees were not "engaged in the 'production of goods for commerce,'" or "in commerce"; and that the defendant was a "service establishment" all of whose activity was intrastate.

■ We think that the employees here in question are "engaged * * * in the production of goods for commerce" within § 7(a), and for that reason we do not find it necessary to decide whether they are also "engaged in commerce." First, are they engaged in the production of goods at all? Section 3(j), 29 U.S.C.A. § 203(j), defines that phrase as meaning, "employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof." Whatever may be thought of the applicability of this definition down to the last clause, we are satisfied that the "occupation" of these men was "necessary to the production" of the clothes. If instead of leasing space in the defendant's building, the manufacturers had each owned and occupied a whole factory of his own, this conclusion seems to us scarcely debatable. Cutters and stitchers cannot work in a cold or filthy building; they must have light and power to drive their machines; they cannot be required to carry goods from one story to another. Those who make and keep the factory fit for them in these ways are as "necessary" to "production" as they are themselves.[1] Yet it would as much defeat the purpose of the act, as expressed in § 2, 29 U.S.C.A. § 202, to deprive such workmen of its protection when they chance to be employed by a different employer, as when they are employed by the employer of the cutters and stitchers. And a competing dressmaker may find his rival's lower rent as "unfair" a differential against him in the cost of production, as lower wages; he will indeed feel it less directly, but it may still be felt. We may therefore start with the assumption that Congress did not mean to draw any line, based merely upon the division of the same duties among several employers, unless the language of the act very plainly requires us to believe that it did. We can find none that compels us so to believe; on the contrary § 3(i) which includes "parts and ingredients" of "goods" with the goods themselves, confirms our understanding. The history of the clause affords further confirmation; it originally read: "or in the making of tools or dies used in the

[1] Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 20; S. H. Robinson & Co. v. Larue, Tenn.Sup. Nov. 29, 1941, 156 S.W.2d 432; Wood v. Central S. & G. Co., D.C., 33 F.Supp. 40; Lefevers v. General Export I. & M. Co., D.C., 36 F.Supp. 838; Muldowney v. Seaberg Elevator Co., D. , C., 39 F.Supp. 275; Fleming v. Pearson Hardwood Flooring Co., D.C., 39 F. Supp. 300. Rogers v. Glazer, D.C., 32 F.Supp. 990; and Goldberg v. Worman, D.C., 37 F.Supp. 778, concerned "retail establishments" and are not to the contrary.

production of such goods in any State." That obviously implied that the later use of the tools and dies—otherwise outside the act—might characterize them enough from the outset to put within it those who made them. The final form of words chosen was far more general, it is true, but there is no indication of any change in the original intent in this regard.

To this the defendant answers that it proves too much, for Congress could not have meant to impose "fair labor standards" upon everyone who might chance to contribute any necessary "ingredient," or service to the production of goods "produced for commerce." The miller who furnishes the flour to a baker who sells bread in other states could not have been intended; or the cutler who sells knives to a wholesale butcher; or the service station which repairs and fills a manufacturer's trucks; or the chemist who supplies alcohol to a perfumer. Stated so generally, the argument may be sound; at any rate we will assume arguendo that the purveyor of "ingredients" or services to all-comers at random will not find himself within the act merely because some part of what he sells eventually finds its way into "goods produced for commerce." Perhaps in the end it will turn upon the distribution of his customers among those who are engaged in interstate commerce and those who are not; here, as so often, the test may be one of degree. We need not answer, for here at any rate no such dilemma presents itself. As we have said, the work of the defendant's employees is in kind substantially the same as it would be if the manufacturers employed them directly. That is the substance of the matter. Since the words and the purpose of the act coalesce so far, we will not allow ourselves to be drawn into dialectical niceties which are not before us and whose answer need not compromise the step we are taking.

■■ Nor do we think that the defendant is a "service establishment the greater part of whose * * * servicing is in intrastate commerce"; § 13(a) (2). Possibly it is not a "service establishment" at all; perhaps that phrase should be limited to those who serve consumers directly, like tailors, or garages, or laundries; the juxtaposition of retail selling and "servicing" does indeed suggest as much. But it is enough for our purpose that, if it is a "service establishment," at least its exemption must depend upon the extent to which its servicing is intrastate. Suppose for example, that these manufacturers, instead of pressing the clothes themselves, sent them out to other shops which pressed only for them; the fact that the pressing took place in the same state as the cutting and stitching would not, we think, exempt the pressers; their servicing would be "in interstate commerce." The "servicing" being a part of "production," the test should be what kind of production it is a part of. The question is really the same as that we have just considered: i.e., whether it is important how that production is divided among employers. It cannot be that if the exemption extends beyond retail "servicing," it is the character of the "servicing" itself that counts, divorced from the "production" of which it is a part. Again, we should be met by the anomaly arising from such an interpretation—the capricious incidence of the act resulting from the accident of the industrial division of the whole process.

The defendant's last argument is based upon §§ 5 and 8, 29 U.S.C.A. §§ 205, 208, which prove, it says, that the act covers only the employees of employers who are themselves "engaged in" interstate commerce. Acknowledging, as it must, that § 6, 29 U.S.C.A. § 206, commands "every employer" without limitation to "pay to each of his employees" the standard wage, and that § 7 declares that "no employer" shall "employ any of his employees" for more than the prescribed hours, the defendant rests its argument upon the constitution and functions of the "industry committees." Since these must be composed only of employers "engaged in" interstate commerce, and since they have power to fix the rate of wages, the argument is that the act cannot apply to employers who are not represented upon them. We do not agree. Section 5(a) does not confine the "Administrator" to committees for "each industry engaged in commerce"; he may also appoint them for industries "engaged * * * in the production of goods for commerce." One third of its membership must, it is true, "represent employers in the industry"; and § 8 gives power to the committees to fix the wage in the "industry" (not over 40 cents an hour) and to report to the "Administrator," who is to approve the report "if he finds that the recommendations are made in accordance

with law, are supported by the evidence * * * and * * * will carry out the purposes of this section"; otherwise he is to refer back the question to the same or another committee. (Subd. d.) Section 3 (h) defines an "industry" as including not only a "branch" of an industry, but "a group of industries."

█ It is certainly undesirable, and it is probably impossible, to define with accuracy just what are the limits imposed upon the "Administrator's" choice by § 5, but if we read subdivisions a and b together and interpolate in their proper places the definitions of § 3(h) and § 3(j), we get substantially the following. The "Administrator" is directed to appoint a number of persons "representing employers" for each "group of industries" whose employees are "employed * * * in any process or occupation necessary to the production" of "goods for commerce." Certainly this grants him the power if he thinks best to put upon one committee an employer "engaged * * * in the production of goods for commerce," like the defendant, with employers "engaged in interstate commerce," like the tenants. Opp Cotton Mills v. Administrator, 312 U.S. 126, 149, 150, 61 S.Ct. 524, 85 L.Ed. 624. The history of §§ 6 and 7 in Congress leaves no doubt that this is the right view. In the Senate the sections read in substance as they now do, though the wording was somewhat different (Senate Bill 2475 passed July 31, 1937). The House amended them to limit them to employers engaged in commerce or in industry affecting commerce (taking the view now urged by the defendant) and to include all the employees of such employers. The conference report particularly dealt with this difference (House Report 2738, 75th Congress 3rd Session pp. 29 and 30) and declared that the only test should be the occupation of the employees; Senator Pepper, one of the managers in the Senate, expressly stated on the floor that this was its meaning.

As has already appeared from the decisions cited, the question now at bar has come up a number of times when the ancillary service was performed by employees of the same employer who was himself "engaged in commerce"; and the result has been fairly uniform. We have found five decisions of appellate courts which have dealt with employees of an employer, who was not "engaged in commerce," or whom at least the courts treated as not so "engaged." So far the score is four to one against the view we take. In Killingbeck v. Garment Center Capitol Inc., 259 App. Div. 691, 20 N.Y.S.2d 521; Robinson v. Massachusetts Mutual Life Insurance Co., Tenn.Sup., Nov. 29, 1941, 158 S.W.2d 441; Cecil v. Gradison, Ohio App. 1st Dist. Nov. 17, 1941, 40 N.E.2d 958; and Pedersen v. Fitzgerald Construction Co., 3rd Dept. Nov. 12, 1941, 262 App.Div. 665, 30 N.Y.S.2d 989, it was held the act did not apply to employees who were assisting in the work of another employer, himself "engaged in commerce." It is true that in some of these it would have been something of a strain upon the word, "production," to say that the employees were "engaged in the production of goods" at all; but it is doubtful that the courts meant to rely upon any such distinction, and it is for this reason that we count them against our view. On the other hand the Third Circuit in Fleming v. A. B. Kirschbaum Co., 124 F.2d 567, agrees with us and indeed in one or two matters went further than we have found it necessary as yet to go. In the district courts Farr v. Smith Detective A. & N. W. Service Inc., 38 F.Supp. 105, went off upon the fact that the ancillary services to the employer engaged in interstate commerce were occasional; but Allen v. Moe, 39 F.Supp. 5, must be counted with Fleming v. Kirschbaum Co., though it is not on all fours.[2] Obviously the question will not be set at rest until the Supreme Court makes an authoritative ruling.

Judgment reversed.

[2] Merryfield v. F. M. Hoyt Shoe Corp., D.C., N.H., 41 F.Supp. 794, is to the contrary.