SOUTHERN PACKAGE CORPORATION *v.* WALTON.

(In Banc. Feb. 15, 1943. Suggestion of Error Overruled March 15, 1943.)

[11 So. (2d) 912. No. 35152.]

SMITH, C. J., dissenting.

**Drake & Drake**, of Port Gibson, and **Henley, Jones & Woodliff**, of Hazlehurst, for appellant.

**Berger & Gholson**, of Port Gibson, for appellee.

Argued orally by **W. S. Henley**, for appellant, and by **Miss Carruthers Gholson**, for appellee.

**McGehee, J.**, delivered the opinion of the court.

This appeal presents for decision the following questions:

1. Whether a night watchman employed by a manufacturer of lumber and veneer products, a substantial portion of which are shipped out of the State of Mississippi, is engaged in producing goods for interstate commerce or in an occupation necessary to the production of goods for interstate commerce, so as to be entitled to the benefits of the federal "Fair Labor Standards Act of 1938," 52 Stat. at L. 1060, Title 29 U. S. C. A., secs. 203 (j), 206, 207 and 216 (b), where such night watchman performs no services other than making an hourly round of the plant at night, while it is not in operation, and punches a watchman's clock located at various stations on the premises of said plant, and is employed for the purpose of reporting any fires and trespassers, and who is kept on duty only in order to enable his employer to obtain reduced fire insurance rates or premiums upon the buildings, machinery, and fixtures situated on the premises, and except for which purpose it is admitted that he would not have been employed.

2. If the Act applies in favor of such watchman does a cause of action for "overtime, liquidated damages (or

penalties), and attorney's fees'' under the Fair Labor Standards Act, supra, survive the death of the employee, where neither the Act creating the right to recover such compensation or damages, nor any other federal statute, provides for such survival?

3. If the Act applies to such a watchman and the cause of action survives his death, does the Mississippi one-year statute of limitations (section 2301, Code of 1930) apply to suits for the recovery of the amounts here claimed, as being penalties allowed against an employer for non-compliance with the terms of the Act?

The suit was filed in the circuit court of Claiborne County, on February 13, 1941, by Fred Walton, employee, against the appellant, Southern Package Corporation, employer, alleging the corporation's ownership and operation of a box manufacturing plant in said county during the period of the plaintiff's employment, as night watchman, from August 14, 1939, to February 29, 1940, when he received for such services less than the minimum wages per hour and was on duty for longer hours per week than are prescribed by the said Fair Labor Standards Act of 1938. It is also alleged that according to the terms of this Act, sections 206 and 207 thereof, he was entitled to receive one and one-half times his regular wages for all work done in excess of forty-four hours per week from August 14, 1939, to October 23, 1939, when the minimum wage in effect under aid act was twenty-five cents per hour; that he was entitled to receive one and one-half times his regular wages for all work done in excess of forty-two hours per week from October 23, 1939, to February 27, 1940, when the minimum wage prescribed under said Act was thirty cents per hour; and that under section 216(b) of said Act he was entitled to an additional amount equal to the total wages due for overtime work and a reasonable attorney's fee.

The sections of the Act above referred to provide for the relief claimed in the declaration under the facts there-

in stated, provided the plaintiff is entitled to the benefits thereof.

Fred Walton died on August 24, 1941, and the suit was thereafter revived, over the objection of the defendant, in the name of his widow, Mrs. Eula May Walton, as administratrix of the estate. Thereupon certain pleas of the defendant were ·permitted to be withdrawn to allow the filing of a demurrer, alleging no cause of action shown, the want of causal connection between the employment of Fred Walton and the production of goods for shipment in interstate commerce, and the non-survivability of the alleged cause of action. Upon the overruling of this demurrer, pleas were again filed and the cause submitted to the trial judge for decision upon an agreed statement of the facts, without the intervention of a jury, resulting in the rendition of a judgment for the plaintiff in the sum of $400 for overtime, an additional equal amount as liquidated damages, and an attorney's fee of $100, or the total sum of $900 and costs. From this judgment the defendant prosecutes this appeal.

It was stipulated in the agreed statement of facts that the nature of the business in which the defendant was engaged, the character and duration of the employment involved, and the duties of the employee thereunder, were as hereinbefore stated. It was further stipulated that if the employee was entitled to the benefits of the Fair Labor Standards Act, Title 29 U. S. C.·A., secs. 206, 207 and 216 (b), there would be accrued under the provisions of said Act the sum of $400 for overtime, of which amount $376 accrued more than one year prior to the filing of the suit, and the balance within one year thereof; that the plaintiff also claims an additional $400, described as liquidated damages under section 216 (b) of said Act, and a reasonable attorney's fee, liability for both of which sums the defendant denied; also, that "no suit or claim has been filed for the minimum wage, and it is agreed that no amount is due hereunder nor claimed in this suit for alleged failure to pay the minimum wage, and that said

minimum wage provision of the Fair Labor Standards Act is not involved herein;''; that the said Fred Walton was paid for his services the amount that the defendant contracted to pay him, ''which amount is agreed upon as the actual value of said services;'' that the defendant could have employed more than one person to perform said services at the same rate of pay per hour as was paid to said Fred Walton, and no overtime would have accrued, and that if he had not accepted his pay without protest, defendant would have employed two night watchmen, and thereby incurred no liability for time and one-half time for overtime, and that wherefore the defendant has in nowise profited by the said use of one employee as a night watchman instead of dividing said employment between two employees; and that the said Walton requested this employment with full knowledge of the time that he was to be on duty and of the pay that he was to receive, without complaint or protest until the filing of this suit.

It was also agreed that the plant did not operate at night during the period of Walton's employment, and that the defendant corporation was not engaged at night in the production of goods for interstate commerce while he was on duty; that when fires were kept under the boilers in said plant at night, it was done by a fireman kept on duty for that purpose, and that when repairs were made occasionally at night to the machinery, such work was done by employees other than the said Walton—a stipulation which distinguishes the case from that of Hart v. Gregory, 218 N. C. 184, 10 S. E. (2d) 644, 649, 130 A. L. R. 265, wherein the Court allowed recovery under the Act by a night watchman who was required to pump the boilers up at night to keep the water in them as long as the steam was up so they would not get dry, and where the Court said: ''The present case we think comes within the provisions of the Fair Labor Standards Act, as the duties of this night watchman were more than that ordinarily required of one so termed. The duty of plaintiff

was to keep water in the boiler so that in the morning steam could easily be available. If the boilers were not kept filled up at night, they would have burned dry and that would have ruined them and made them unfit for use.''

In defining what constitutes goods produced for interstate commerce, section 3 of the Fair Labor Standards Act of 1938, Title 29 U. S. C. A., sec. 203, sub-section (j), states that the term '' 'Produced' means produced, manufactured, mined, handled, or in any other manner worked on in any State; and for the purposes of this chapter an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State.''

Thus, it will be seen that the portion of the language which is to be construed in determining whether the act is to be applied to the employment of the night watchman in the case at bar are the words, ''or in any process or occupation necessary to the production thereof, in any State,'' since he was manifestly not engaged in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods.

In adopting the foregoing and rather unusual definition of the term ''produced,'' as related to the production of goods for interstate commerce, so as to include among those engaged in such employment also those in any occupation ''necessary'' to the production of such goods, it should be presumed that the Congress thus enlarged the meaning of the term as far as it was deemed expedient. Although numerous terms used in the Act are specifically defined therein, the meaning of the word ''necessary'' was left intact as found in Webster's Dictionary—''Essential to a desirable or projected end or condition; not to be dispensed with without loss, damage, inefficiency or the like; as, a necessary tool.'' Moreover, unless the

term "any occupation necessary to the production thereof" is to be given an expanded meaning by judicial construction, it may be confidently asserted that under the agreed statement of facts in the instant case, the act would have no application, since the work of this employee had only the most tenuous relation, and was not in any fitting sense "necessary," to the production of goods by this employer for commerce. Presumably the night watchman slept during the daytime, while the other employees were engaged in the production of the goods for commerce. He contributed nothing to such work of production, nor to enable those engaged in production to more efficiently perform their duties. No more goods were produced by reason of his employment, and he would no doubt have been kept on duty for the purpose for which he was employed even if it had been necessary to close down the plant for an indefinite period because of a break-down, or on account of other incidents interfering with its continued operation. If the plant had been running at night, the services of a night watchman would not have been required at all, even to satisfy the request of the insurance company.

It was held in the case of Hart v. Gregory, supra, as heretofore indicated, that a night watchman whose duties also include the pumping of water into boilers, so that they will not burn dry and be ruined, but will be fit for service when production starts the next day, is engaged in an "occupation necessary to the production" of goods within the meaning of the Act here under consideration. In the course of its opinion, the court made the observation, italicizing its language, that "it was necessary to have those boilers filled up with water, and if they had not been kept filled up at night they would have burned dry and that would have ruined the boilers." The decision discloses that the turning point in the case entitling the night watchman to the benefits of the Act was the fact that he had these other duties to perform in addition to his regular duties as a night watchman. After this

case was remanded it was again tried, and on conflicting evidence the question was submitted to the jury as to whether the night watchman actually performed the services other than night-watching, as claimed, and the jury decided this issue in the negative, and upon the second appeal the judgment denying liability was affirmed: Hart v. Gregory, 220 N. C. 180, 16 S. E. (2d) 837; Vol. 1 Wage & Hour Cases, 1172. To the same effect is the case of Wood v. Central Sand & Gravel Co. (D. C. Tenn.), 33 F. Supp. 40. In the case of Jewel Tea Co. v. Williams, 10 Cir., 118 F. (2d) 202, 206, it is stated that the Act "does not extend to employment that merely affects interstate commerce. If there could be doubt as to the correctness of this interpretation, it is set at rest by the legislative history of the Act." To the same effect is the case of Chapman v. Home Ice Co. (D. C. Tenn.), 43 F. Supp. 424, holding that the Act does not apply to employees whose duties merely "affect" interstate commerce. The term "necessary" means more than merely convenient. United States v. Atchison, T. & S. F. R. Co. (D. C.), 220 F. 215.

In the case of Doyle v. Johnson Bros., 176 Misc. 656, 28 N. Y. S. (2d) 452, it was held that a night watchman whose duties were to guard lumber in the lumber yard of his employer, engaged in interstate commerce, and to open gates of the yard to permit passage of employer's trucks, and to act as fireman tending a furnace to keep the mill properly heated, was "engaged in production of goods for interstate commerce" within the meaning of this Act. Also, in the case of Milam v. Texas Spring & Wheel Co. (Tex. Civ. App.), 1941, 157 S. W. (2d) 653, it was held that a night watchman guarding premises on which products sold in interstate commerce were manufactured, and occasionally taking telephone orders, and telephone calls after business hours for the man in charge of the employer's business and reporting them to him at his residence, is engaged in interstate commerce. Thus it will be seen that in all of the foregoing cases a recovery

was permitted under the Act in favor of night watchmen, because they were engaged in other manual activities which were at least indirectly connected with production.

However, a recovery has been allowed in other cases on the ground that it was the duty of the night watchman to guard the materials, intended for interstate commerce, while stored on the yard, and when loaded in freight cars or otherwise awaiting shipment. S. H. Robinson & Co. v. Larue, 1941, 178 Tenn. 197, 156 S. W. (2d) 432, affirming 156 S. W. (2d) 359. But none of the cases, supra, are controlling in the instant case, because the agreed statement of facts is entirely silent as to whether the duties of the employee, Fred Walton, related to guarding and protecting any goods assembled for manufacture or awaiting shipment in interstate commerce at the plant in question. Since it is agreed that he was employed only to enable the employer to obtain reduced insurance rates or premiums "upon the building, machinery, and fixtures situated on said premises," we must assume, for the purpose of this decision, that his duties did not involve the guarding and protecting of the goods for shipment in interstate commerce, as we are not warranted in enlarging upon the agreed statement of facts so as to include a factor not covered by such agreement.

In the case of Abadie v. Cudahy Packing Co. (D. C.), 37 F. Supp. 164, 166, the Court was dealing with a situation where a bookkeeper or ledger clerk was claiming the benefits of the Act, and Judge Borah, in rendering the opinion, said: "Even if it could be said that defendant was engaged in the production of goods for commerce because it 'handled or in any other manner worked on' the goods sold in interstate commerce it would not follow that plaintiff was employed in an occupation necessary to the production thereof as there is no causal relationship between his occupation and production. Plaintiff's occupation may have been necessary in respect to defendant's business but his duties as ledger clerk were

not so closely related to production as can be considered necessary thereto.''

The legislative history mentioned in Jewel Tea Co. v. Williams, supra, relating to the enactment of the Fair Labor Standards Act, discloses that the conference draft of the bill, which was finally enacted into law after the Senate had refused to accede to the House amendment, which broadened the coverage of the bill by requiring time and a half for overtime for all employees of an ''employer engaged in commerce in an industry affecting commerce,'' restored the test of coverage contained in the original Senate bill, and that Senator Pepper, of Florida, a member of the Conference Committee which prepared the Act as adopted, said, in answer to an objection to the broad scope of the Act, ''I want it distinctly stated that this proposed law is not applicable to all employees of an industry which itself is engaged in interstate commerce. It is applicable only to those employees who themselves are engaged either in interstate commerce, or the production of goods for interstate commerce and the contrary theory was definitely rejected by the Committee.'' 83 C. R. 9168 (Senate—75th Cong., 3rd Sess., June 14, 1938); also, Jax Beer Co. v. Redfern, 5 Cir., 124 F. (2d) 172.

An examination of the decisions rendered by other courts in construing the Act has failed to reveal a case where the circumstances involved were such as to present the precise question now before us. Our search for a precedent among the reported cases has been at least interesting and entertaining, if not rewarding. For instance, it has been held that the benefits of the Act apply in favor of ''Redcaps'' employed at union terminal stations, Pickett v. Union Terminal Co. (D. C. Tex.), 33 F. Supp. 244, reversed on other grounds Union Terminal Co. v. Pickett, 5 Cir., 118 F. (2d) 328, certiorari denied 313 U. S. 591, 61 S. Ct. 1115, 85 L. Ed. 1546, vacated 314 U. S. 704, 62 S. Ct. 55, 86 L. Ed. 563, certiorari granted 314 U. S. 704, 62 S. Ct. 55, 86 L. Ed. 704, affirmed 315

U. S. 386, 62 S. Ct. 659, 86 L. Ed. 914; that by virtue of the constitutional power of Congress to regulate commerce among the states (Art. 1, section 8, sub-section 3, of the Federal Constitution) it may, under this Act, regulate the business of an employer who is not himself engaged in interstate commerce, Fleming v. A. B. Kirschbaum, 3 Cir., 124 F. (2d) 567, Fleming v. Arsenal Bldg. Corp., 2 Cir., 125 F. (2d) 278, affirmed in Kirschbaum v. Walling, 316 U. S. 517, 525, 62 S. Ct. 1116, 86 L. Ed. 1638, wherein it was held contrary to the decision in Killingbeck v. Garment Center Capitol, 259 App. Div. 691, 20 N. Y. S. (2d) 521; 259 App. Div. 1076, 21 N. Y. S. (2d) 610, that elevator operators, and engineers, firemen, watchmen, etc., employed by an owner who leased his building to tenants, a number of whom manufactured goods which were shipped in interstate commerce, and in which business the owner of the building who employed these men had no interest, were engaged in the production of the goods for interstate commerce, on the ground that they furnished light, heat, protection, etc., needed by the tenants in the production of such goods; also, in another case it was held that "interstate commerce" in oil which was sold by producer within the state, and shipped to a refinery therein, from which refined products were later sent outside the state, began when the crude oil first moved in the pores of the restraining sand stratum, and that hence a laborer engaged in operating an oil rig was entitled to the benefits of the act, since the refinery, although not his employer, would ultimately ship the refined products out of the state. Divine v. Levy (D. C.), 39 F. Supp. 44; all contrary to the decision in Crescent Cotton Oil Co. v. State of Miss., 257 U. S. 129, 42 S. Ct. 42, 66 L. Ed. 166, holding that manufacture is not commerce, and that the fact, of itself, that an article when in the process of manufacture, is intended for export to another state, does not render it in an article of interstate commerce; also, in another case it is held that cooks at a boarding house near a logging camp

preparing food to serve to crews of men producing goods in interstate commerce were likewise engaged in interstate commerce under this Act. Womack v. Consolidated Timber Co. (D. C. Or.), 43 F. Supp. 625.

Then, too, our attention is also called to an Interpretative Bulletin, presumably prepared by a member of the legal staff of the Department of Labor, and which is a brief in behalf of the employee, even to the extent of contending that the burden of proof is upon the employer, when sued under the Act, to prove that the employee-plaintiff is not entitled to its benefits. And a few courts have held that such a bulletin is entitled to ''great weight.'' We think it is entitled to the same thoughtful consideration that we have accorded to the brief of the employee's counsel at the bar in the instant case, although we find the bulletin less persuasive. While we would not presume to suggest a revised edition of this bulletin, it would seem that the case of Warren-Bradshaw Drilling Co. v. Hall, 317 U. S. 596, 63 S. Ct. 123, 87 L. Ed. 99, decided November 9, 1942, would not be an inappropriate annotation thereto, wherein it was held that the burden of proof is upon the employee to show that he was engaged (1) in the production of goods, within the meaning of the Act, and (2) that such production was for interstate commerce.

This legislation has been held to be remedial and entitled to a liberal construction in favor of employees, nevertheless it is also true that as to some employers hiring laborers engaged in producing goods for interstate commerce, it is highly penal and discriminatory. For instance, section 216(a) imposes a fine not exceeding $10,-000, or imprisonment for not more than six months, or both, upon an employer found guilty of violating the minimum wage and maximum hour provisions of the Act, and section 216(b) allows the time and a half for overtime, and an additional equal amount as ''liquidated damages'' for such violation (the designation as ''liquidated damages'' evidently being adopted for these pen-

alties as a basis for conferring jurisdiction of suits to enforce the act upon all courts of competent jurisdiction in view of the then existing Federal statutes giving exclusive jurisdiction to the Federal courts of suits to enforce penalties prescribed by Federal laws), and then section 207(b) provides that "no employer shall be deemed to have violated subsection (a) by employing any employee for a work-week in excess of that specified in such subsection without paying the compensation for overtime employment prescribed therein if such employee is so employed . . . in pursuance of an agreement, made as a result of collective bargaining by representatives of employees certified as bona fide by the National Labor Relations Board . . ." That is to say, the terms of the Act enable only such employers of labor engaged in producing goods for interstate commerce to escape the fine, imprisonment, compensation for overtime and liquidated damages imposed for a violation thereof, as are willing to submit to the dictates of some labor agitator who is perchance more interested in collective dues than in obtaining the fruits of collective bargaining for the benefit of the man who toils.

However, the constitutionality of the Act was upheld in the case of United States v. Barby, 312 U. S. 100, 61 S. Ct. 451, 85 L. Ed. 609, 132 A. L. R. 1430, and Opp Cotton Mills v. Administrator of Wage and Hour Division, 312 U. S. 126, 61 S. Ct. 524, 85 L. Ed. 624, and the wanton waste of "plowing under" needed hours of labor during a period of manpower shortage in a great world crisis has until recently remained unhindered. Our problem is, therefore, to interpret and apply the provisions of the act as written, but we are not inclined to expand their meaning by judicial construction any further than has already been done.

In the case of Kirschbaum v. Walling, 316 U. S. 517, 62 S. Ct. 1116, 1120, 86 L. Ed. 1638, supra, the Court speaks of the term engaged in any occupation necessary to the production of goods for interstate commerce as

having to be construed "in the context of the history of federal absorption of governmental authority over industrial enterprise;" also, of "when the federal government takes over such local radiations in the vast network of our national economic enterprise and thereby radically *readjusts the balance of state and national authority*"; and then speaks of the task of the Court in construing the Act as one of "accommodations as between assertions of *new federal authority and historic functions of the individual states*," and says that "the expansion of our industrial economy has inevitably been reflected in the extension of federal authority over economic enterprise and its *absorption of authority previously possessed by the States*." (Italics ours.) But, if it be assumed that the tenth article of the Amendments to the Constitution of the United States is still in good working order, wherein it provides that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people," one is prone to wonder from whence comes this "new" federal authority to readjust "the balance of state and national authority" and the right of "absorption of authority previously possessed by the States."

In the cases of Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F. (2d) 567, supra; and Fleming v. Arsenal Bldg. Corp., 2 Cir., 125 F. (2d) 278, supra, affirmed by the United States Supreme Court in the case of Kirschbaum v. Walling, supra, the Court held that in the first of said cases, where the owner of the building employed an engineer, firemen, elevator operators, watchmen, porter, carpenter, and a carpenter's helper; and in the other case, where the owner employed the firemen, electrician, elevator operators, watchmen, and porters, who performed the customary duties of persons charged with the effective maintenance of the building, such employees were entitled to the benefits of the Act where the buildings, respectively, were leased for the most part by their employer to tenants engaged in interstate commerce, on the ground

that, "The engineer and the firemen produce heat, hot water, and steam necessary to the manufacturing operations. They keep elevators, radiators, and fire sprinkler systems in repair. The electrician maintains the system which furnishes the tenants with light and power. The elevator operators run both the freight elevators which start and finish the interstate journeys of goods going from and coming to the tenants, and the passenger elevators which carry employees, customers, salesmen, and visitors. The watchmen protect the building from fire and theft. The carpenters repair the halls and stairways and other parts of the buildings commonly used by the tenants. The porters keep the buildings clean and habitable." It would seem that if the electrician keeping the electrical appliances in repair was engaged in the production of goods for interstate commerce or in an occupation necessary to the production thereof because his services contributed to furnishing light to the tenants engaged in interstate commerce, then by the same token the employees of the power and light company generating the electricity would likewise be more directly engaged than he in the production of goods for interstate commerce; that by analogy those furnishing light and heat in the capitol building for the benefit and comfort of the judges are likewise engaged in the construction of this Fair Labor Standards Act; and it would also appear, as contended in the lower court by the defendant in the case of Fleming v. Arsenal Bldg. Corp., supra, that the miller who furnishes the flour to a baker who sells bread in other states, the cutler who manufactures and sells knives to a wholesale butcher, the service station operator who repairs and fills a manufacturer's trucks, and the chemist who supplies alcohol to a perfumer, doing business in interstate commerce, would likewise be so engaged. In that case the lower court responded to this argument by merely saying, "We need not answer, for here no such dilemma presents itself." Of course, no logical answer to this argument could have been made. At any rate, we

are of the opinion that to apply the Act to the employment of the night watchman in the case at bar, under the facts embodied in the agreement of counsel herein, would be to extend its benefits much further than has heretofore been done by any court, since the employees not engaged in the production of goods for interstate commerce who have been held, nevertheless, under previous decisions of the courts, to be engaged in an occupation necessary to the production thereof, and entitled to the benefits of the Act, were in each instance, almost without exception, at least on duty while such goods were being produced, or were employed specially to guard the goods while awaiting shipment. Even though we should be of the opinion that such a liberal construction is justified, nevertheless, as an intermediate tribunal so far as final authority to construe the Act is concerned, we refrain from assuming the responsibility of further liberalization.

From what we have said it follows that we do not reach the other two questions involved.

The judgment of the lower court will be reversed, and judgment rendered here for the appellant.

Reversed and judgment here for the appellant.

### Dissenting Opinion.

**Smith, C. J.**, dissents; being of the opinion that Fred Walton's employment by the appellant was within and covered by the provisions of the Fair Labor Standards Act of 1938. Kirschbaum Co. v. Walling, 316 U. S. 517, 62 S. Ct. 1116, 86 L. Ed. 1638.