BARNHILL, J., dissents.
The complaint alleges, in part:
"(2) That at the time hereinafter complained of the defendant was engaged in the business of manufacturing and selling lumber, and said defendant at said times sold lumber to parties in or at places outside of the State of North Carolina and transported or had the same transported from his said mill or place of business at Shawboro, North Carolina, to places outside of North Carolina. That the defendant, as employer and the plaintiff as employee were at the times hereinafter referred to and complained of engaged in the production and sale of goods in commerce within the meaning and definitions of the `Fair Labor Standards Act of 1938.'
"(3) That the plaintiff was employed by the defendant and worked for him, as aforesaid, at his said lumber or manufacturing plant at Shawboro, North Carolina, from November 7th, 1938, to and including June 10, 1939, the said plaintiff having been an employee of the defendant, engaged in commerce or in the production of goods for commerce within the meaning of the aforesaid Act of 1938. The said plaintiff, over said period of time, pursuant to his said employment, performed work and labor for said defendant at his aforesaid place of business, and in connection therewith and as a part thereof — his duties and services having been those of a watchman at said plant or mill, inspection of and work in connection with the boilers and other machinery used in the operation of said lumber mill and the manufacture of said lumber, and other work in connection with the operation of said lumber mill and the manufacture of said lumber.
"(4) That during said time the plaintiff worked for the defendant in said employment eleven hours per day, or a total of 2,376 hours, and was paid as wages only the gross amount of $255.61. That the defendant paid the plaintiff nothing for the overtime which he worked, and paid plaintiff wages of only 10.33c per hour.
"(5) That plaintiff was entitled to be paid by defendant a minimum wage of not less than 25c per hour and should have worked during said period of time, unless paid for overtime, a maximum of only 1,364 hours during the said 216 days that he was employed by and worked for the said defendant in the production of goods for commerce, as aforesaid. *Page 186 
"(6) That because of the matters and things hereinbefore set out defendant is indebted to the plaintiff for unpaid minimum wages of $197.37 and unpaid overtime compensation of $379.50, with interest, together with additional equal amounts as liquidated damages, making a total of $1,153.74, with proper interest; and plaintiff is further entitled to recover of the defendant a reasonable attorney's fee, and the costs of this action." Judgment for the above sum was demanded.
Defendant in his answer says: "Answering the second section of the complaint, the defendant admits that he is engaged in the business of manufacturing and selling lumber and that some of the lumber manufactured by him is transported to places outside of North Carolina. . . . Answering the third section of the complaint the defendant admits the plaintiff to have been in his employment from November 7, 1938, to, and including June 10, 1939, as a night watchman, with the duties usually incident to such employment and none other. . . . Answering the fifth section of the complaint, the defendant denies the same. He says, however, that if the plaintiff comes within the provisions of the `Fair Labor Standards Act of 1938,' which is again denied, nevertheless, the defendant has fully discharged each and every of his obligations unto the plaintiff." The other material allegations of the complaint are denied.
Plaintiff testified, in part: "I had occasion to work for the defendant, Mr. P. P. Gregory. I worked for him from November 7th, 1938, up until June 10, 1939. I was night watchman for him at his sawmill at Shawboro, Currituck County, North Carolina. It is about 11 miles from here and Shawboro is on the main highway from here to Norfolk, and is on the Norfolk Southern Railroad, which runs from Norfolk into North Carolina. I worked seven days a week and eleven hours a day. This was from November 7, 1938, to June 10, 1939, and was according to the terms of my contract of employment. I was to make twelve punches, I was to go on at six and make the last punch at five in the morning. That is 11 hours a day, seven days to the week. My duties were to punch the clock, go around the lumber yard and the mill, see that there was no fire or anything like that, see that nobody was taking anything away on my hours. There was no one else on duty at the mill when I was on duty, and this is a pretty fair sized mill, I should say it employed about 20 or 25 men regularly. They were cutting lumber and piling lumber and loading cars. It was a lumber mill. Under myemployment I was required to pump the boilers up to keep the water in theboilers as long as the steam was up, so they would not get dry. I had to pump them every two or three hours until about 12 o'clock some nights, and sometimes longer, depending on how the fire was left. I would pump the water with a force pump operated by steam, and when the *Page 187 
pump would be broken down I would use an injector — the injector was used by turning on to pump the water from the well into a barrel, and then use a pump to pump it from the barrel into the boiler. Mr. Gregory would keep fires going in the boilers all night and there would be fire in the morning. They would take and throw in wood, and would never hardly ever have to use a match to light it. They ran the mill with steam generated from those boilers, and the steam furnished the power for the machinery in the mill. It was necessary to have those boilers filled up with water, andif they had not been kept filled up at the night they would have burned dryand that would have ruined the boilers. The mill foreman told me to pump up the boilers at 8 o'clock, and they would have to be pumped after that. I have pumped as high as four or five times in a night, and would average three or four times. A glass showed whether the boilers did or did not have water in them, and I was supposed to keep enough water in them so that the fireman could raise the steam in the morning without slowing down. I was not paid anything extra for that. Mr. Duncan asked me if I would watch the woodpile and not let anybody take any of the wood away, except he would send a note to let them have it, and I would occasionally deliver under these orders. During the eleven hours that I was on the job I was required to stay on the defendant's mill premises, and did stay. During the time I was working over there Mr. Gregory sold some of the lumber from this operation in Norfolk, Va. I have been on the yard different times when the trucks were loading for Norfolk. There was lumber put out there for the Ballard Fish Company at Norfolk that they built the new oyster house with. I heard Mr. Gregory say once or twice he had orders in Norfolk, some orders for lumber for the Cement Plant over there. During the time I was working for Mr. Gregory I have been in Norfolk and seen some of Mr. Gregory's lumber up there. It was lumber that had been shipped from the Shawboro mill. They were loading cars right about every day right straight along, going out. I have heard Mr. Gregory and Mr. Duncan say that they had to get the lumber ready and get the trucks so that they could haul it out of there so as to load on a sailboat for hauling to Baltimore. Mr. Gregory had trucks operating in and out of the yard. The sailboat was in Elizabeth City and the Baltimore I referred to is in the State of Maryland. There was a railroad siding at the mill alongside of the main railroad track, and that would be picked up by a through freight train during the night, bound for Norfolk. The through freight did not make local stops between Shawboro and Norfolk. The local freight ran between 10 and 11 o'clock during the day. Mr. Gregory had two or three trucks operating in and out of that plant while I worked there, and they hauled from Shawboro to Norfolk to deliver lumber, and haul logs from the woods to the mill, *Page 188 
and hauled lumber from the mill over here in Elizabeth City to load on the boat. That mill would cut from 16,000 to 25,000 feet of lumber a day. The batch of papers which your hand me are all the pay envelopes which I received while working over there, and they total $255.61. The amount of money that is designated on each one of these pay envelopes is the amount that I received at those different times. I did not receive any additional compensation other than what was paid me in those pay envelopes. The amount shown on the outside of the envelope would be the amount that was in them. It would take me from 18 to 20 minutes to make my rounds just as watchman, and I had to make the rounds every hour. The 18 or 20 minutes did not include the time it would take me to fill up the boilers. I made the rounds as watchman, made twelve times daily, and that would be eleven hours. . . . I was supposed to pump the water in the boilers at eight o'clock and ten o'clock, but I did it three or four times during the night, because the boilers were so hot, and I had to pump them up in order to keep water in them. The mill did not run at night. I was not required to keep steam in the boilers, I was just required to keep water in them. The pump I was talking about was a steam force pump, and to start it I had to turn a valve on the pump and a valve on the pipe line to go into the boilers. I had to stay there and watch it. It would take the steam force pump from ten to fifteen minutes to put water in the boiler. I would have to stay there about ten to fifteen minutes to each boiler and there were two boilers. I would not turn them both on at the same time. I never ran two pumps at the same time. . . . I was informed by Mr. Duncan and Mr. Gregory to look after the water in the boilers the night they hired me. . . .In addition to beingemployed to punch the clock. I was employed to keep water in the boilers,to see that there would be water in the boilers so they could get steam inthe morning. When I made my rounds I would observe whether the boilers needed water or not, I would have to go up in front so I could see the water glass, and when I finished my rounds I would then start the pump. I did not fire the boilers. I did nothing around the yard, nor the mill, in the way of working. I was not employed while the mill was running. . . . Q. You did nothing toward the actual manufacture or production of the lumber which was manufactured? Ans.: No. There were 62 steps of stairway every punching, and I quit the job because I did not feel like I could punch the clocks every 30 minutes. The through freight trains stopped at Shawboro to pick up loaded cars. . . . I should say the mill site occupied 20 acres."
Tommy Harrington testified, in part: "I can't call the names of the places where I made deliveries of lumber in Norfolk while Mr. Hart was working at the mill, but I do remember delivering lumber to Davis *Page 189 
Milling Company in Norfolk. I can't say that I remember other places, and I don't know how many different places I carried lumber. I have helped make deliveries of lumber from the mill to boats lying here at the foot of Main Street at Elizabeth City. I don't know where the lumber went."
John Johnson testified, in part: "I drive a truck for the defendant, and I was working for him at his Shawboro mill between the dates of November, 1938, and June, 1939. I did haul some lumber and make deliveries in the State of Virginia between the dates of November, 1938, and June, 1939. I carried a little to Pinner's Point and to Smith-Douglass in Norfolk. My truck was not a regular lumber truck, it was a log trailer and would carry from 1,000 feet to 3,000 feet, and that is the type of truck I would make deliveries with up there in Virginia. I would make deliveries up there while Mr. Hart was working for the defendant once a month and sometimes once every two weeks. The Smith-Douglass I refer to is a large fertilizer manufacturing plant in Norfolk. The kind of lumber that I would make deliveries of up in the State of Virginia would be pine in the form of manufactured boards, some of it would be 2x4's and sills. I was working for Mr. Gregory the whole time Mr. Hart was working for him. The plant of Mr. Gregory at Shawboro lies between the State Highway on one side and the Norfolk Southern Railroad on the other. The highway is the State Highway leading from Elizabeth City to Norfolk."
The plaintiff made numerous exceptions and assignments of error and appealed to the Supreme Court.
At the close of plaintiff's evidence the defendant in the court below made a motion for judgment as in case of nonsuit, C. S., 567. The court below allowed the motion and in this we think there was error.
We take it that there is no question as to the jurisdiction to sue in the State court.
In 14 Am. Jur., pp. 440-441, part sec. 247, is the following: "Courts of the United States and of the states have concurrent jurisdiction in all cases between citizens of different states, whatever may be the matter in controversy, if it is one of judicial cognizance, and a conflict of jurisdiction is always to be avoided. It is therefore a general rule that the right of a plaintiff to prosecute his suit in a court, having once attached, cannot be taken away by proceedings in another court. So, it may be stated as a general rule that whenever a legal right arises and the State *Page 190 
court is competent to administer justice, the right may be asserted in the State court, although the Federal Court may have jurisdiction of the same question, subject, however, to the proviso that there is no law limiting jurisdiction to the Federal Courts. In regard to State courts the law is also said to be settled that courts of general jurisdiction therein have power to decide cases involving the rights of litigants under the Constitution or statutes of the United States unless deprived of the right so to do by the terms of the Federal Constitution or acts of Congress." For another clear statement of the same rule, see 21 C.J.S., p. 797. There was plenary evidence that defendant was engaged in interstate commerce within the purview of the act.
In National Labor Relations Board v. Jones Laughlin Steel Corp.,301 U.S. 1, the Supreme Court upheld the constitutionality of the National Labor Relations Act of 5 July, 1935, and speaking through the ChiefJustice, said: (op. 37, 38) "Although activities may be intrastate in character when separately considered, if they have such a close and substantial relation to interstate commerce that their control is essential or appropriate to protect that commerce from burdens and obstructions, Congress cannot be denied the power to exercise that control. . . . The close and intimate effect which brings the subject within the reach of Federal power may be due to activities in relation to productive industry although the industry when separately viewed is local." The argument that the percentages between interstate and intrastate commerce in the distribution of goods produced is a material consideration, is held futile in two decisions of the Supreme Court of the United States. In Santa CruzFruit Packing Co. v. National Labor Relation Board, 303 U.S. 453 (decided 28 March, 1938), the Chief Justice, said: (op. 467) "There is thus no point in the instant case in a demand for the drawing of a mathematical line. . . . The critical words of the provision of the National Labor Relations Act in dealing with the described labor practices are `affecting commerce,' as defined. Section 2 (6). It is plain that the provision cannot be applied by a mere reference to percentages and the fact that petitioner's sales in interstate and foreign commerce amounted to 37 per cent, and not to more than 50 per cent, of its production cannot be deemed controlling."
The question for our determination: Did plaintiff, an employee of the defendant, come within the provision of the Fair Labor Standards — Acts of 1938 (29 U.S.C.A., secs. 201-219)? We think so, under the facts and circumstances of this case.
The language of the act to be construed, 29 U.S.C.A., sec. 203 (j), being sec. 3 (j) of the act, reads as follows: "For the purposes of this act an employee shall be deemed to have been engaged in the production of goods, if such employee was employed in producing, manufacturing, *Page 191 
mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereofin any State." (Italics ours.)
Plaintiff testified: "It was necessary to have those boilers filled up with water, and if they had not been kept filled up at night they would have burned dry and that would have ruined the boilers. The mill foreman told me to pump up the boilers at 8 o'clock, and they would have to be pumped up after that. I have pumped as high as four or five times in a night, and would average three or four times. A glass showed whether the boilers did or did not have water in them, and I was supposed to keep enough water in them so that the fireman could raise the steam in the morning without slowing down. I was not paid anything extra for that. . . . During the eleven hours that I was on the job I was required to stay on the defendant's mill premises, and did stay. . . . In addition to being employed to punch the clock, I was employed to keep water in the boilers, to see that there would be water in the boilers so they could get steam in the morning. When I made my rounds I would observe whether the boilers needed water or not, I would have to go up in front so I could see the water glass, and when I finished my rounds I would then start the pump."
In Wood v. Central Sand and Gravel Co. and Fischer Lime and Cement Co. (U.S. Dist. Court, Western Dist. of Tenn., Memphis Division),33 F. Supp. 40, the decision was rendered in an employee suit by a night watchman who also fired an engine to maintain steam in said engine for use each morning. There was an elaborate, well-written opinion, by Martin,District Judge, citing many authorities, in which the night watchman was allowed to recover. We quote from p. 46: "In a later case, Southern PacificCo. v. Industrial Accident Commission, 251 U.S. 259, 64 L.Ed., 258, 40 Sup. Rep., 130, 10 A.L.R., 1181, the Supreme Court cites the Pendersoncase, the Shanks case, and also N. Y. Central R. Co. v. Porter,249 U.S. 168, and Kinzell v. Chicago, M. St. P. R. Co., 250 U.S. 130, and says: (op. 263) `Generally, when applicability of the Federal Employers Liability Act is uncertain, the character of the employment in relation to commerce may be adequately tested by inquiring whether at the time of the injury, the employee was engaged in work so closely connected with interstate transportation as practically to be a part of it.'" Applying the true principle of these Supreme Court decisions to the facts concerned here, it is found that the plaintiff, serving as he was as night watchman to protect all the property and equipment at an employer's plant where interstate commerce goods were produced and also performing the additional duties of firing an engine so as to keep up steam and have the engine ready each morning for use in connection with interstate commerce was in *Page 192 
actuality engaged in the production of goods for interstate commerce within the meaning of sections 6 and 7 of the Fair Labor Standards Act of 1938. Certainly, Congress intended no such unjust discrimination against a night watchman, situated as was the plaintiff in the instant case, as would result from an unjustifiably narrow interpretation of the humane Fair Labor Standards Act.
The present case we think comes within the provisions of the Fair Labor Standards Act, as the duties of this night watchman were more than that ordinarily required of one so termed. The duty of plaintiff was to keep water in the boiler so that in the morning steam could easily be available. If the boilers were not kept filled up at night, they would have burned dry and that would have ruined them and made them unfit for use. It is clearly apparent that the man who attended to the boiler in the day was engaged in "occupation necessary to the production thereof" of goods. Why should not the man at night whose duty it was to keep the boiler fit for service in the production of goods receive the same benefit accorded men directly at work producing these goods? His duties were more than a night watchman, he fed water to the boilers which were necessary in the production of goods.
We think this case distinguishable from Rogers v. Glazer,32 F. Supp. 990.Otis, J., writing the opinion, at p. 992, said: "I do not think that it can be said that a watchman for such an establishment as the defendants maintain, a part of whose duty it may be said — a very small part of whose duty was to watch the pile of scrap iron on the premises, I do not think that it can be said that he is engaged in an occupation necessary to the production of goods. Perhaps I may be giving too literal an interpretation to the word `necessary.' Certainly it is not necessary to the production of goods that there should be a watchman at all. In many yards scrap is assembled and sold without any watchman and I do not think that it can be said that a watchman produces goods. He may do that which is helpful to the business, he may help to produce the profits that arise from the business. He does not produce the goods." In the present case he performed a duty necessary in the production of goods.
The United States Department of Labor Interpretative Bulletin No. 1, issued November, 1938, at pp. 4 and 5, reads as follows: "The second category of workers included, those engaged `in the production of goods for (interstate) commerce,' applies, typically but not exclusively, to that large group of employees engaged in manufacturing, processing, or distributing plants, a part of whose goods moves in commerce out of the State in which the plaint is located. This is not limited merely to employees who are engaged in actual physical work on the product itself, because by express definition in section 3 (j) an employee is deemed to *Page 193 
have been engaged `in the production of goods, if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State.' Therefore the benefits of the statute are extended to such employees as maintenance workers,watchmen, clerks, stenographers, messengers, all of whom must be considered as engaged in processes or occupations `necessary to the production' of the goods. Enterprises cannot operate without such employees. If they are not doing work `necessary to the production' of the goods they would not be on the pay roll." Although this administrative interpretation is not binding on this Court, its reasonableness is persuasive.
The court permitted defendant to ask plaintiff on cross-examination the following question: "You did nothing toward the actual manufacture or production of the lumber which was manufactured?" The witness answered, "No." We think the court was in error in permitting this question, for, as the question was stated it involved a conclusion of law for the court, and was not an evidentiary factual matter. He could tell what he did, but whether these acts constituted the "manufacture or production of lumber" was a question of law for the court to decide.
For the reasons given, we think the judgment of the court below must be
Reversed.
BARNHILL, J., dissents.