**LORENZETTI v. AMERICAN TRUST CO. et al.**

**SEMERIA et al. v. WELLS FARGO BANK & UNION TRUST CO. et al.**

**Nos. 21826, 21889.**

District Court, N. D. California, S. D.

May 19, 1942.

Picard & McCarty and Francis McCarty, all of San Francisco, Cal., for plaintiff Lorenzetti.

Charles R. Garry, of San Francisco, Cal., for plaintiff Semeria et al.

Brobeck, Phleger & Harrison, of San Francisco, Cal., for defendant American Trust Co.

Heller, Ehrman, White & McAuliffe, of San Francisco, Cal., for defendant Wells Fargo Bank & Union Trust Co.

Keyes & Erskine, of San Francisco, Cal., for defendant American Bldg. Maintenance Co. et al.

Warner W. Gardner, Sol., Irving J. Levy, Associate Sol., and Jacob D. Hyman, Principal Atty., all of Washington, D. C., and Dorothy M. Williams, Regional Atty., of San Francisco, Cal. (Abner Brodie and Erwin B. Ellmann, both of Washington, D. C., of counsel), for Wage & Hour Division, United States Department of Labor, Amicus Curiae.

ST. SURE, District Judge.

Plaintiffs each brought action under the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq., for overtime compensation, liquidated damages, costs, and attorneys' fees, under Section 16(b) of the

Act,[1] on the ground that they are employees engaged in interstate commerce or the production of goods for commerce, within the meaning of the Act. Plaintiff Lorenzetti and other parties in interest whom he represents in Action No. 21889-S, worked as janitors in the building of the defendant American Trust Company. In Action No. 21826-S plaintiff Semeria represents himself and others who did the janitorial work for the defendant Wells Fargo Bank and Union Trust Company. The American Building and Maintenance Company, which is a defendant in both actions, contracted with defendant banks to furnish to them all janitorial service and equipment on a flat monthly basis, and pursuant to its contracts, employed and paid the janitors to work at the banks. The actions, which involve similar questions, were tried together.

The court will first consider whether the banks are engaged in interstate commerce.

The banks are California corporations. During the period covered by the actions some of the out-of-state dealings of the American Trust Company were as follows: It maintained accounts in banks in other states and in foreign countries, and out-of-state and foreign banks had accounts with it. It conducted business and communicated with many other banks outside of California. It mailed commercial paper representing several million dollars to points outside of California. It received for deposit transfer checks, promissory notes, bonds, coupons, letters of credit, certificates and warrants, from outside the state. It loaned millions of dollars to borrowers outside the state. It loaned money on canned goods and dried fruit which was shipped out of California. It issued commercial letters of credit covering importations from foreign countries and other states, and received letters of credit for goods being shipped out of California, involving large amounts of money. The amount of drafts with bills of lading attached sent out of the state and received from points outside the state totalled many millions of dollars. The bank purchased and sold bonds outside the state, and acted as agent for banks in other states for the purchase and sale of securities. Credit information was obtained from outside the state by wire and mail. The bank had daily contact with dealers in securities, by wire, teletype or telephone. It rendered an investment service to persons not residents of California. Its trust department managed estates for beneficiaries outside the state. It acted as transfer agent for nonresidents of the state, and mailed the stock certificates to the new holders. It prepared new issues of stock in its trust departments, and received stock from customers and banks outside the state for the purpose of issuing new certificates. In connection with the probate of estates, the bank sometimes bought and sold real property in other states. It mailed checks and other negotiable instruments for collection out of state, and also acted as collection agent for other banks. It was a member of the Federal Reserve System, and was enabled by such membership to transmit credit throughout the United States. It frequently collected commercial items for the Federal Reserve System. The bank sold travelers' checks to its customers for use all over the world, and received commissions for such sales. It took security title in goods which moved in interstate and foreign commerce, and bought and sold foreign exchange. It advertised occasionally in national publications and in a foreign banking directory. In its activities the bank constantly employed the channels of interstate communication.

It was stipulated at the trial that the interstate transactions of the Wells Fargo Bank during this period were substantially the same as those of the American Trust Company.

---

[1] § 16(b), 29 U.S.C.A. § 216(b).

"Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated, or such employee or employees may designate an agent or representative to maintain such action for and in behalf of all employees similarly situated. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

Defendants say that although banking affects commerce it does not constitute commerce.

No cases have been found which directly hold that banks are or are not engaged in interstate commerce. Defendants cite as authority that private banks are not so engaged, Engel v. O'Malley, 219 U.S. 128, 31 S.Ct. 190, 55 L.Ed. 128, and Musco v. United Surety Co., 196 N.Y. 459, 90 N.E. 171, 134 Am.St.Rep. 851. The first case held that a state statute regulating the receipt of deposits did not burden interstate or foreign commerce though the receipt of the money might later lead to its transmission over state lines. The language used by Mr. Justice Holmes would indicate that he considered some aspects of banking might be interstate commerce:

"When, as in this matter, the Constitution takes from the states only a portion of their otherwise absolute control, there may be expected difficulties in drawing the dividing line, because where it shall be put is a question of more or less. The trouble is inherent in the situation, but it is the same in kind that meets us everywhere else in the law. The question is whether the state law creates a direct burden upon what it is for Congress to control, and the facts of the specific case must be weighed." [219 U.S. 128, 31 S.Ct. 193, 55 L.Ed. 128.]

This case did not hold that interstate banking would not constitute interstate commerce, but that the regulation by the state of a local phase of banking did not infringe the commerce clause.

The case of Musco v. United Surety Co., supra, involved a similar statute, regulating the taking of deposits by institutions other than transatlantic steamship companies, banks, and trust companies. The court held the statute valid, but said (196 N.Y. at pages 467 and 468, 90 N.E. at page 174, 134 Am.St.Rep. 851):

"It is doubtless true that this statute regulating the receipt of deposits may incidentally and indirectly affect the business of transmitting moneys abroad. But it is well settled that the law, although in a limited degree affecting interstate commerce, is not for that reason a needless intrusion upon the federal jurisdiction or strictly a regulation of interstate commerce, but is to be considered as an ordinary police regulation, and therefore not invalid. Hennington v. Georgia, 163 U.S. 299, 16 S.Ct. 1086, 41 L.Ed. 166."

The field of interstate commerce is an ever broadening one. It was said in Kentucky Whip & Collar Co. v. Illinois Cent. R. Co., D.C., 12 F.Supp. 37, 41, 44, affirmed 299 U.S. 334, 57 S.Ct. 277, 81 L.Ed. 270:

"New necessities, new evolutions of society into more complex conditions, evoke the exercise of an old power in a new way. The control of new things does not require new power if the old power still exists. * * *

"The economic tide is inevitably forcing on the courts the need for giving ever expanding latitude to the commerce clause of the Constitution. Any other course will unerringly lead to a retardation of our civilization."

In 1824, in Gibbons v. Ogden, 9 Wheat. 1, 229, 6 L.Ed. 23, holding that Congress had exclusive jurisdiction over navigable waters, Mr. Justice Johnson defined commerce as follows:

"Commerce, in its simplest signification, means an exchange of goods; but in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange, become commodities, and enter into commerce; the subject, the vehicle, the agent, and their various operations, become the objects of commercial regulation."

In Adair v. United States, 208 U.S. 161, 177, 28 S.Ct. 277, 281, 52 L.Ed. 436, 13 Ann.Cas. 764, the phrase "commerce among the several states" was defined as comprehending "traffic, intercourse, trade, navigation, communication, the transit of persons, and the transmission of messages by telegraph,—indeed, every species of commercial intercourse among the several states * * *."

The tendency of the courts in recent years, particularly in the case of remedial and social legislation, has been to give an even more liberal construction to the words "interstate commerce", and to hold constitutional Federal laws covering matters over which the states have had exclusive jurisdiction. They also tend to apply these laws over a wide field.

The Fair Labor Standards Act is remedial, with a humanitarian end in view, and therefore is entitled to a liberal construction. See Bowie v. Gonzalez, 1 Cir., 117 F.2d 11; Lefevers v. General Export Iron & Metal Co., D.C., 36 F.Supp. 838; Fleming v. Hawkeye Pearl Button Co.,

8 Cir., 113 F.2d 52; Tennessee Coal, Iron & R. Co. v. Muscoda Local No. 123, D.C., 40 F.Supp. 4; Divine v. Levy, D.C., 39 F.Supp. 44.

Interstate commerce "is not a technical legal conception, but a practical one, drawn from the course of business." Swift & Co. v. United States, 196 U.S. 375, 398, 25 S.Ct. 276, 280, 49 L.Ed. 518.

In the case at bar, more weight should therefore be given to the interpretation of the commerce clause found in cases having to do with similar legislation, than to those in which individuals claimed immunity from state taxes or regulations.

The Supreme Court has said that the object of the banking business is "to aid the operation of the laws of commerce." Auten v. United States Bank of New York, 174 U.S. 125, 143, 19 S.Ct. 628, 635, 43 L.Ed. 920.

In Matter of Bank of America National Trust & Savings Association, etc., 14 N.L.R.B. 207, 213, the Board found the Bank subject to the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., saying: "We find that the operations of the respondent have a close, intimate, and substantial relation to trade, traffic, commerce, and transportation among the several States and with foreign countries."

Since the Act applies to industries "affecting commerce" the Board did not find it necessary to decide whether banks are actually engaged in commerce.

We may consider the construction placed by the courts on some of the activities of the banks.

They had interstate transactions in stocks and bonds. In reversing Geiger-Jones Co. v. Turner, D.C., 230 F. 233, 239, which held that a state statute regulating dealings in stocks and bonds burdened interstate commerce, the Supreme Court in Hall v. Geiger-Jones Co., 242 U.S. 539, 557-559, 37 S.Ct. 217, 223, 61 L.Ed. 480, L.R.A. 1917F, 514, Ann.Cas.1917C, 643, said:

"There is no doubt of the supremacy of the national power over interstate commerce. Its inaction, it is true, may imply prohibition of state legislation, but it may imply permission of such legislation. * * *

"The provisions of the law, it will be observed, apply to dispositions of securities *within* the state, and while information of those issued in other states and foreign countries is required to be filed * * *, they are only affected by the requirement of a license of one who deals in them *within* the state. Upon their transportation into the state there is no impediment. * * *

"* * * regarding the securities as still in interstate commerce after their transportation to the state is ended and they have reached the hands of dealers in them, their interstate character is only incidentally affected by the statute."

See, also, Alabama & N. O. Transp. Co. v. Doyle, D.C., 210 F. 173, 182.

They sent and received drafts with bills of lading attached, to and from points outside the state. Bills of lading have been held to be instrumentalities of commerce. United States v. Ferger, 250 U.S. 199, 39 S.Ct. 445, 63 L.Ed. 936; Almy v. People of State of California, 65 U.S. 169, 24 How. 169, 16 L.Ed. 644; Fairbank v. United States, 181 U.S. 283, 21 S.Ct. 648, 45 L.Ed. 862.

The banks financed the sale and purchase of goods to and from other states. In General Motors Corporation v. Federal Trade Commission, 2 Cir., 114 F.2d 33, 36, certiorari denied 312 U.S. 682, 61 S.Ct. 550, 85 L.Ed. 1120, the court held that when financing activities wholly within a state are part of a unified plan of selling and financing commodities to a different state, such activities may be interstate commerce.

The banks sent checks to other states for collection, and acted as agencies for the collection of checks from out of state. In Noble State Bank v. Haskell, 219 U.S. 104, 111, 31 S.Ct. 186, 188, 55 L.Ed. 112, 32 L.R.A.,N.S., 1062, Ann.Cas.1912A, 487, the statement was made by Mr. Justice Holmes that one of the primary conditions of successful commerce at the present time is "the possibility of payment by checks drawn against bank deposits, to such an extent do checks replace currency in daily business."

The banks maintained an investment service for nonresidents of the state. They furnished credit information to nonresidents. The transmission of intelligence across state lines has been held to be interstate commerce. International Text Book Co. v. Pigg, 217 U.S. 91, 30 S.Ct. 481, 54 L.Ed. 678, 27 L.R.A.,N.S., 493, 18 Ann.Cas. 1103; Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 81 L.Ed. 953.

In carrying on all its transactions in other states and nations, the banks necessarily made constant use of interstate and foreign communication facilities. In Electric Bond & Share Co. v. Securities & Exchange Commission, 303 U.S. 419, 432, 433, 58 S.Ct. 678, 682, 82 L.Ed. 936, 115 A.L.R. 105, the registration provisions of the Public Utility Holding Company Act of 1935, 15 U.S.C.A. § 79 et seq., were held applicable to utility holding companies because a part of their business "involves continuous and extensive use of the mails and instrumentalities of interstate commerce. * * *" In Associated Press v. National Labor Relations Board, 301 U.S. 103, 57 S.Ct. 650, 654, 81 L.Ed. 953, the Supreme Court found that the Associated Press, which acted as a clearing house of news between its respective members, did not sell news or operate for profit. It was held that the Associated Press was nevertheless engaged in interstate commerce, because its "operations involve the constant use of channels of interstate and foreign communication. They amount to commercial intercourse and such intercourse is commerce within the meaning of the Constitution. *Interstate communication of a business nature, whatever the means of such communication, is interstate commerce regulable by Congress under the Constitution.*" (Emphasis supplied.)

It is clear that the banks were constantly involved in "interstate communication of a business nature." It would seem that they are at least as squarely within the commerce clause as a non-profit association acting as an exchange for news items, for they dealt in instrumentalities of commerce for profit, and in fact were themselves media for carrying on commerce.

It is interesting to note that although banks were specifically exempted from the operation of the Federal Trade Commission Act, 15 U.S.C.A. § 41 et seq., and Congress had before it that Act when it incorporated by reference Section 9 of the Trade Commission Act in the Fair Labor Standards Act, they are not included among those industries which are exempted from the provisions of the latter Act. Since the Federal Trade Commission Act applies only to industries engaged in commerce, the exclusion of banks from that Act would indicate that Congress believed banks to be so engaged. In Hurst & Son v. Federal Trade Commission, D.C., 268 F. 874, 877, the court in holding that Act constitutional, said in passing:

"Banks and common carriers were doubtless excepted from the provisions of the act, because each was subject to the direction and control of a separate commission largely similar to that of the Trade Commission."

Section 3 of the Fair Labor Standards Act broadly defines commerce as "trade, commerce, transportation, transmission, or communication among the several States or from any State to any place outside thereof."

The Administrator ruled on March 16, 1942, that savings banks and commercial banks are covered by the Act. 5 Wage Hour Rept. 199. While this ruling is not binding upon the court, "its reasonableness is persuasive." See Hart v. Gregory, 218 N.C. 184, 10 S.E.2d 644, 650, 130 A.L.R. 265.

Defendants urge that a holding that state banks are engaged in interstate commerce would be revolutionary, and would greatly inhibit the power of the state to regulate them. A declaration by this court in these actions that in its opinion banks are engaged in commerce does not alter the nature of their business, nor does it have the effect of changing in any regard the existing powers of the state. If banks are engaged in interstate commerce, then it may be assumed that the state never has had power to prevent or unreasonably burden their interstate business. On the other hand, the state presumably has power to control the local business of the banks. In Kelly v. Washington, 302 U.S. 1, 9, 58 S.Ct. 87, 92, 82 L.Ed. 3, Mr. Chief Justice Hughes said:

"Under our constitutional system, there necessarily remains to the states, until Congress acts, a wide range for the permissible exercise of power appropriate to their territorial jurisdiction although interstate commerce may be affected. * * * States are thus enabled to deal with local exigencies and to exert in the absence of conflict with Federal legislation an essential protective power. And when Congress does exercise its paramount authority, it is obvious that Congress may determine how far its regulation shall go. There is no constitutional rule which compels Congress to occupy the whole field. Congress may circumscribe its regulation and occupy only a limited field. When it does so, state regulation outside that limited field and

otherwise admissible is not forbidden or displaced."

I am of the opinion that banks are industries engaged in commerce within the meaning of the Act.

The question then arises whether the banks or the American Building and Maintenance Co. were the employers of the janitors within the meaning of the Act. It is not disputed that the American Building and Maintenance Co. hired the janitors, paid them, assigned them to their duties, and were responsible for insurance and other incidents of their employment. Section 3(g) of the Act provides that "'Employ' includes to suffer or permit to work." Plaintiffs assert that inasmuch as the banks suffered and permitted the janitors to work and exercised through their officials some control over the manner in which the work was done, they were employers under the Act.

I think it cannot seriously be contended that the banks were the employers of the janitors. The facts of the employment here come squarely within the holding in Bowman v. Pace Co., 5 Cir., 119 F.2d 858, 860. In that case defendant warehouse company contracted with the Forsyth Detective Service for watchman service at its plant. The court found that

"Forsyth, being in that line of business, on his own account contracted with the Pace Company for a monthly consideration to maintain satisfactory watchman service at these premises; and on his own account hired Bowman at a weekly wage to watch there, putting him under the direction to some extent of the Pace Company to insure that the service should be satisfactory. The hiring, transferring, or discharging of Bowman was Forsyth's affair. Bowman could and did look to Forsyth alone for his pay."

The court said: "If the employment as watchman comes under the Act, Forsyth owes him the minimum wage, for he is Bowman's employer. Instead of using only one man to furnish the service contracted for, Forsyth could have hired other men to work in eight-hour shifts, or done the work himself. It would be most unjust to enforce the overtime rates, which make up a large part of Bowman's claim, against the Pace Company, who had no control over this matter."

The rule formulated by that court was a logical and sound one, and should be applied to the case at bar: "If one has not hired another expressly, nor suffered or permitted him to work under circumstances where an obligation to pay him will be implied, they are not employer and employee under the Act."

See, also, Wells Fargo & Co. v. Taylor, 254 U.S. 175, 41 S.Ct. 93, 65 L.Ed. 205.

Defendants urge that even if the banks were engaged in commerce, the janitors would not be covered by the Act, because they were not employed by the banks but by the American Building and Maintenance Company, which did a purely intrastate business.

Section 6(a) of the Act, relating to minimum wages, reads: "Every employer shall pay to each of his employees who is engaged in commerce or in the production of goods for commerce wages at the following rates—". Section 7(a) relating to maximum hours, provides: "No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce—". Inasmuch as there is no requirement to be found in the Act that the employer be engaged in commerce, it has been held that it is the nature of the employment, not the character of the employer's business, that is the test. Fleming v. American Stores Co., D.C., 42 F.Supp. 511; Jax Beer Co. v. Redfern, 5 Cir., 124 F.2d 172; Hall v. Warren-Bradshaw Drilling Co., D.C., 40 F.Supp. 272; Jewel Tea Co. v. Williams, 10 Cir., 118 F.2d 202; Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567; Fleming v. Arsenal Bldg. Corp., 2 Cir., 125 F.2d 278. In the last mentioned case, Judge Learned Hand said that it would defeat the purpose of the Act if workmen whose labors were necessary to production were deprived of its protection because they were employed by someone other than the manufacturer.

From the language of the Act and the reasoning of the cases I conclude that the fact that the janitors were not employed by the banks does not of itself bar them from the benefits of the Act.

It must then be determined whether the janitors were "employees engaged in commerce" within the contemplation of the Act. Section 3(j) provides that an employee is engaged in production of goods for commerce if he is employed "in any process or occupation necessary to the

production thereof." It has been held in cases involving production for commerce that the word "necessary" does not denote absolute indispensability, but that if the work performed is "convenient and appropriate" or "essential and beneficial" to production, it is "necessary" within the meaning of the Act. Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567, 572; S. H. Robinson & Co. v. LaRue, Tenn. App., 156 S.W.2d 359, 361.

There is no similar test provided in the Act itself for determining whether an employee is engaged in commerce, as distinguished from production for commerce. To ascertain what employees Congress intended to include, we may therefore apply, with slight modification, the test propounded in cases arising under the Federal Employers Liability Act, 45 U.S.C.A. § 51 et seq.; that is, whether the employee is engaged in interstate transportation or in work so closely related to it as to be practically a part of it; whether he facilitates interstate transportation.[2]

This rule was applied in Pickett v. Union Terminal Co., D.C.Tex., 33 F.Supp. 244, 247. The court concluded that "redcaps" employed by defendant at its terminal, were employees engaged in interstate commerce under the Fair Labor Standards Act. The court also held that tips should not be considered part of their wages. The Circuit Court reversed the District Court on this latter ground alone. 118 F.2d 328. On March 2, 1942, the Supreme Court sustained the Circuit Court's decision with regard to the computation of wages, but said "Since the basic elements of Pickett's case are no longer in dispute, the crucial issue again is whether the minimum wages were paid." 315 U.S. 386, 62 S.Ct. 659, 665, 86 L.Ed. —. Thus the Supreme Court sustained by implication the District Court's holding that the redcaps were engaged in interstate commerce, and, it may be inferred, the propriety of applying the test used in Federal Employers Liability cases.

By substituting the words "interstate commerce" for "interstate transportation" this rule may be used in ascertaining whether the janitors were engaged in interstate commerce.

There is no unanimity found, even in the Supreme Court, in the numerous cases which apply this rule, as to the kind of activity which constitutes interstate commerce. The decisions range from the holding that a cook who prepared meals for a bridge gang was engaged in commerce (Philadelphia B. & W. R. Co. v. Smith, 250 U.S. 101, 39 S.Ct. 396, 63 L.Ed. 869), to the decision that a yard conductor on an interstate road, injured while alighting from a freight engine to report for orders, was not in interstate commerce. Erie R. Co. v. Welsh, 242 U.S. 303, 37 S.Ct. 116, 61 L.Ed. 319.

One line of cases holds that track maintenance men and similar employees of railroads are engaged in commerce; another holds that they are not. In Rader v. Baltimore & O. R. Co., 7 Cir., 108 F.2d 980, 984, certiorari denied 309 U.S. 682, 60 S.Ct. 722, 84 L.Ed. 1026, the court held that a section man clearing the roadbed of brush was engaged in commerce. The court discusses the two lines of authority having to do with maintenance employees. To the contention of defendant that the test is whether the work being done is "static or dynamic", the court said:

"Such a test would virtually exclude all employees except those physically engaged in the actual movement of the train. We do not believe the authorities justify such a narrow construction of the Act. It seems to us a better test, and one not inconsistent with the authorities is, whether or not the character of the work is such as to facilitate the movement of trains in interstate commerce. Of course, even under this test, the work might be so remote as to exclude it from the intendment of the Act.

"If 'tracks and bridges are as indispensable to interstate commerce' as are engines and cars, as was held in the Pedersen case, and which we do not think has been over-

[2] Rader v. Baltimore & O. R. Co., 7 Cir., 108 F.2d 980, certiorari denied 309 U.S. 682, 60 S.Ct. 722, 84 L.Ed. 1026; Pickett v. Union Terminal Co., D.C., 33 F.Supp. 244, reversed 5 Cir., 118 F.2d 328, Williams v. Jacksonville Terminal Co., 315 U.S. 386, 62 S.Ct. 659, 86 L.Ed. —; Philadelphia & R. R. Co. v. Di Donato, 256 U.S. 327, 329, 41 S.Ct. 516, 65 L.Ed. 955; Philadelphia B. & W. R. v. Smith, 250 U.S. 101, 103, 39 S.Ct. 396, 63 L.Ed. 869; Kinzell v. Chicago M. & St. P. R. Co., 250 U.S. 130, 133, 39 S. Ct. 412, 63 L.Ed. 893; Shanks v. Delaware, Lackawanna & Western Railroad Company, 239 U.S. 556, 558, 36 S.Ct. 188, 60 L.Ed. 436, L.R.A.1916C, 797; Pedersen v. Delaware, Lackawanna & Western R. Co., 229 U.S. 146, 33 S. Ct. 648, 57 L.Ed. 1125, Ann.Cas.1914C, 153.

ruled, we think it must be held that a section man engaged in clearing the roadbed or right-of-way of brush, is likewise engaged in work indispensable to interstate commerce, as applied to transportation therein. We recognize that such work is somewhat more remote than the actual repair of the track or bridge over which the trains move, but at the same time we think it must be recognized that a roadbed or right-of-way free from obstacles, including weeds, brush and timber so that an unobstructed view thereof may be had, is highly essential to the safety and protection of those who are passengers of the railroad, as well as the general public using the highways which intersect such railroads. If so, such work facilitates interstate transportation."

The Administrator of the Wage and Hour Division, who appeared as amicus curiae, has suggested that Section 3(j), relating to workers engaged in production, and Section 3(b), relating to workers engaged in commerce, should be held to include "commensurate areas of coverage", for otherwise there would be attributed to Congress the intent "to assume greater authority over a class of employees whose amenability to constitutional regulation was subject to doubt than over a class of employees as to whom Congress had not infrequently assumed control in the past." Such a construction, he says, would not only "'infer Congressional idiosyncracy,' but 'impute to Congress a desire for incoherence * * * and for drastic legal differentiation where policy justifies none,' Keifer & Keifer v. Reconstruction Finance Corp., 306 U.S. 381, 393, 394 [59 S.Ct. 516, 83 L.Ed. 784] (1939), a result which sound principles of statutory construction preclude."

It would seem a strained interpretation of the Act, and in conflict with the doctrine that remedial legislation should be liberally construed, to hold that an employee, who would be covered by the Act if the person receiving the benefits of his services were engaged in production for commerce, would not be entitled to the advantages of the Act if his employer was actually engaged in commerce. It was said in Divine v. Levy, D.C., 39 F.Supp. 44, 47,

"* * * In the interpretation of whether or not a factual situation brings about interstate commerce under this Act we should be liberal rather than strict.

"The purpose of the Act would be frustrated if the courts were to limit its beneficence to labor by technical interpretations."

The court will therefore be guided by those cases which liberally apply the Federal Employers Liability test.

The courts have not been reluctant to hold that employees are engaged in commerce. It was decided that one employed by a railroad to repair and maintain railroad tracks and roadbed was entitled to the benefits of the Act. Morgan v. Atlantic Coast Line R. Co., D.C., 32 F.Supp. 617. In Muldowney v. Seaberg Elevator Co., D.C., 39 F.Supp. 275, it was held that the plaintiff, who was employed as a general handyman and errand boy in defendant's maintenance and repair department, was engaged in work in interstate commerce when he painted parts of the plant, assisted in loading and unloading trucks, and supervised and cleaned a boiler. In Spinner v. Waterways Fuel & Dock Co., Ohio App., 41 N.E.2d 144, a watchman employed by a fuel and dock company to guard a digger boat anchored to the shore of the Ohio River was not exempt as a seaman and therefore was entitled to the benefits of the Act. The court in Elam v. Wolberg, Tenn. Ch., 5 Wage Hour Rept. 136, held an employee hired by a transfer company to load and unload trucks transporting merchandise to and from interstate railway depots in a city was entitled to the minimum wage under the Act. The driver of an intracity mail truck was held to be engaged in commerce in Fleming v. Gregory, D.C., 36 F.Supp. 776. In Mortenson v. Western Light & Telephone Co., D.C.S.D.Iowa, 42 F.Supp. 319, the manager of two plants belonging to a telephone company, who did most of the maintenance labor, and made out daily work and material reports, was in effect held within the Act.

In numerous instances involving production for commerce the courts have held that janitors, watchmen, maintenance men and similar employees are within the Act.[3] It

3 Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567; Fleming v. Arsenal Bldg. Corp., 2 Cir., 125 F.2d 278; Bowie v. Gonzales, 1 Cir., 117 F.2d 11; Fleming v. Atlantic Co., D.C., 40 F.Supp. 654; Wood v. Central Sand & Gravel Co., D.C., 33 F.Supp. 40; Fleming v. Pearson Hardwood Flooring Co., D.C., 39 F. Supp. 300; Flores v. Baetjer, D.C. Puerto Rico, 4 Wage Hour Rept. 471; Abroe v. Lindsay Bros. Co., Mun.Ct. Minneapolis, Minn., 4 Wage Hour Rept. 38; S. H. Robinson & Company, Inc., v. LaRue, Tenn.Sup., 156 S.W.2d 432.

has also been held that such employees are engaged in commerce.[4]

The banks could not properly carry on their business without janitorial service. The fact that they each paid in excess of $1,000 a month for this service indicates that this is true. They depend to a considerable degree upon the appearance of their large and imposing establishments to inspire public confidence. Their officers and employees could not work properly in a building littered with dirt and debris. It may well be said that the work of the janitors was indispensable to the banks, and that it facilitated both the interstate and intrastate business carried on by them.

It has been held that where an employee is engaged both in interstate and intrastate commerce, he is for the purposes of the Act engaged in interstate commerce. Steger v. Beard & Stone Electric Co., D. C.N.D.Tex., 4 Wage Hour Rept. 411; Fleming v. Atlantic Co., D.C., 40 F.Supp. 654, 657. In the latter case the court gives the reason for the rule, as follows:

"The business operations of the defendant are such that it is impossible to determine what proportion of the services of employees is devoted to interstate commerce and to local operations. The business and plant need only be considered in its entirety, and the carpenters and maintenance men are essential to the conduct of that portion of the defendant's business which is interstate, and the fact that the repair of an elevator or a door, or services necessary in furnishing refrigeration, likewise facilitate the local business of the defendant, does not remove the activities of such employees from the realm of interstate commerce, to which such services equally relate.

"In other words, where the business of the employer is substantially interstate, as well as intrastate, and the clerical help, maintenance men and laborers indiscriminately perform services essential to the carrying on of both classes of business, they are engaged in commerce within the meaning of the Act."

In my opinion the janitors are employees engaged in commerce within the intendment of the Act.

Defendants contend that the defendant Building Company is a service establishment which does all its servicing within the state, and that it is therefore exempt from the requirements of the Act under Section 13(a) (2). That section exempts "any employee engaged in any retail or service establishment the greater part of whose selling or servicing is in intrastate commerce."

The phraseology used is significant. The words "engaged in any * * * service establishment" are not synonymous with "employed by any service business." The word "establishment" is defined as "the place where one is permanently fixed for residence or business * * * also any office or place of business with its fixtures." Webster's New International Dictionary, 1931 Ed. The janitors were employed by the Building Company, but the establishments in which they were engaged were the banking establishments.

A distinction between "establishment" and "enterprise" was made in Fleming v. American Stores Company, D.C.E.D.Pa., 42 F.Supp. 511, 521, involving employees of a warehouse which served defendant's chain of grocery stores. Defendant claimed that the warehouse was part of an integrated retail business; that the warehouse was simply incident to the retail business; and that the business in its entirety must be regarded as a "retail establishment" within Section 13(a) (2). But the court said,

"I cannot subscribe to the defendant's view. To do so would be to do indescribable violence to the word 'establishment' in section 13(a) (2).

"It does not follow that because a unit of an enterprise is a component or necessary part of that enterprise, that it is to be so regarded as part and parcel of the whole enterprise as to lose its individual and separate identity as an establishment."

Plaintiffs say that the words "retail" and "service" as used in this section should be read together to determine the scope of a "service establishment." There are cases which suggest that the kind of "service establishment" intended by Congress is akin to a retail establishment; that is, an establishment which sells services instead of goods to the ultimate

4 Steger v. Beard & Stone Elec. Co., Inc., D.C.N.D.Tex., 4 Wage Hour Rept. 411; Spinner v. Waterways Fuel & Dock Co., Ohio App., 41 N.E.2d 144; Muldowney v. Seaberg Elevator Co., D. C., 39 F.Supp. 275; Fleming v. American Stores Co., D.C., 42 F.Supp. 511.

consumer, like a laundry, barber shop, or automobile repair shop.[5] The Administrator has so interpreted the exemption. Whether or not this limitation should be placed upon the term "service establishment", it would seem that Congress could not have intended to exempt a business which contracts to furnish labor to establishments engaged in interstate commerce. The nature of the establishment where the labor is performed, and the type of work done, should be determinative of whether the individual employee is entitled to the benefits of the Act. Otherwise, its provisions could be evaded by the interposition of an independent contractor between the laborer and the interstate business receiving the benefit of his services.

A rule of strict construction should be applied in determining whether an employer comes within one of the exemptions contained in the Act. Fleming v. American Stores Co., D.C.E.D.Pa., 42 F.Supp. 511. It has also been held that where an employee is engaged in interstate commerce, his employer, in order to bring himself within a specific exemption from the provisions of the Act, must bring himself within both the letter and the spirit of one of the exceptions. Bowie v. Gonzalez, 1 Cir., 117 F.2d 11; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52. The Building Company is within neither the letter nor the spirit of the exception, and in my opinion is not exempt as a "service establishment" under Section 13(a) (2).

Defendants do not question the constitutionality of the Act, but urge that it would be unconstitutional if applied to them, because Congress has no power to regulate intrastate activities indirectly affecting commerce. As stated in Mondou v. New York, New Haven & Hartford R. Co., 223 U.S. 1, 47, 32 S.Ct. 169, 174, 56 L.Ed. 327, 38 L.R.A.,N.S., 44, the power of the Federal Government over interstate and foreign commerce "extends incidentally to every instrument and agent by which such commerce is carried on * * *." The court has concluded that the janitors facilitate commerce; that they further it, and help to carry it on; and are therefore engaged in commerce within the Act. If this be the case, their effect on commerce is direct, and the fact that they do their work only in the State of California is immaterial. There is no requirement in the law than an employee must himself cross state lines in order to engage in interstate commerce.

Plaintiffs make claim for overtime and liquidated damages from October 24, 1938, the effective date of Sections 6 and 7 of the Act. Defendants contend that the contracts of employment were made subject to the existing law; that if the Act was applicable to them, there was an implied agreement on the part of the employers not to work their employees more than forty hours a week without paying them overtime compensation; and that for this reason Section 339, subd. 1, of the Code of Civil Procedure of the State of California, providing for a two-year limitation upon actions arising from contracts not founded upon an instrument in writing, bars a portion of the claims for overtime. They also claim that the liquidated damages sought by plaintiffs constitute a penalty created by statute, and are therefore subject to a limitation of one year. Section 340, subd. 1, of the Code of Civil Procedure.

While the existence of the employer-employee relationship brought plaintiffs and their employers within the Act, and the rate at which they were paid determined the amount of overtime to which they are entitled, there would be no liability, were it not for the Act. A liability created by statute has been defined as one which would not exist but for the statute. Fidelity & Deposit Co. of Maryland v. Lindholm, 9 Cir., 66 F.2d 56, 58, 89 A.L.R. 279; Hocking Valley R. Co. v. New York Coal Co., 6 Cir., 217 F. 727, 730.

In Platt v. Wilmot, 193 U.S. 602, 613, 24 S.Ct. 542, 546, 48 L.Ed. 809, the plaintiff urged that the double liability of a stockholder does not arise from statute but is contractual in its nature; in other words, that the stockholder enters into a contract authorized by statute when he purchases his stock. The Supreme Court said: "It is a liability created by the statute, because the statute is the foundation for the implied contract arising from the purchase of or subscription for, the stock, the contract being that the holder of the stock shall be liable in accordance with the terms of the statute."

5 Fleming v. Arsenal Building Corporation, 2 Cir., 125 F.2d 278; Fleming v. A. B. Kirschbaum Co., 3 Cir., 124 F.2d 567; Wood v. Central Sand & Gravel Co., D.C., 33 F.Supp. 40.

Defendants cite no authority for their contention that the liquidated damages provided for in the Act constitute a penalty. In Forsyth v. Central Factory Co., 240 Ala. 277, 198 So. 706, 710, the court said it would presume that Congress knew the distinction when it enacted the provision for liquidated damages. In Hargrave v. Mid-Continent Petroleum Corp., D.C., 36 F.Supp. 233, the court said the purpose of the provision is compensation to the employee; not punishment to the employer. To the same effect are Stringer v. Griffin Grocery Co., Tex. Civ.App., 149 S.W.2d 158; Tapp v. Price-Bass Co., 177 Tenn. 189, 147 S.W.2d 107; Moreno v. Picardy Mills, 173 Misc. 528, 17 N.Y.S.2d 848.

I conclude that the liquidated damages provided for in the Act do not constitute a penalty, and that these claims as well as the claims for overtime, are governed by the provisions of Section 338, subd. 1, of the Code of Civil Procedure applicable to liabilities created by statute. Both actions were filed within the three-year period.

The cases against the banks will be dismissed. Plaintiffs and the other employees whom they represent are entitled to judgment against their employers for overtime compensation as provided for in the Act, from October 24, 1938, or from the date of their employment if in any case such employment occurred subsequent to the effective date of Sections 6 and 7 of the Act; and for an additional equal amount as liquidated damages, and for costs. It will be necessary to reopen the cases to receive evidence as to the identity of plaintiffs' employers, and as to the proper amount of overtime compensation to be allowed, and to fix reasonable attorneys' fees.